**Leroy A. LOVELACE, Plaintiff–Appellant,**

v.

**Jack LEE; Gene Shinault; K. Lester, Defendants–Appellees.**

No. 04–7797.

United States Court of Appeals, Fourth Circuit.

Argued: March 17, 2006.

Decided: Dec. 29, 2006.

**ARGUED:** Matthew Anthony Victor, Victor, Victor & Helgoe, L.L.P., Charleston, West Virginia, for Appellant. Mark Ralph Davis, Senior Assistant Attorney General, Office of the Attorney General of Virginia, Richmond, Virginia, for Appellees. **ON BRIEF:** Judith W. Jagdmann, Attorney General, Richmond, Virginia, for Appellees.

Before WILKINSON, MICHAEL, and MOTZ, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Judge MOTZ joined. Judge WILKINSON wrote a separate opinion concurring in the judgment in part and dissenting in part.

## OPINION

MICHAEL, Circuit Judge:

Leroy Lovelace was an inmate at Keen Mountain Correctional Center (Keen Mountain or prison), a Virginia state prison, in 2002 and 2003. He is a member of the Nation of Islam. In 2002 Keen Mountain adopted a policy to accommodate inmates seeking to observe Ramadan, the Islamic holy month of fasting and prayer. Lovelace participated in the Ramadan observance program for roughly six days in November 2002 before being removed from the "pass list" (the list of participants) for allegedly breaking the fast. He was consequently barred from the special meals for fast participants and from Ramadan congregational prayers for the remainder of Ramadan, a total of twenty-four days. He filed an action against Warden Jack Lee, Assistant Warden Gene Shinault, and Correctional Officer K. Lester (the defendants), alleging violations of the First Amendment, the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc *et seq*. The district court granted summary judgment to the defendants on all claims. Lovelace appeals the summary judgment and two of the district court's procedural rulings.

For the reasons that follow, we vacate summary judgment in favor of Officer Lester in his individual capacity on the RLUIPA and free exercise claims, and we vacate summary judgment in favor of Warden Lee on the claims asserted against him in his official capacity. We affirm the remainder of the district court's rulings.

▮ Our dissenting colleague agrees that Lovelace's case may proceed against Officer Lester because "Lovelace has presented an issue of triable fact as to whether correctional officer Lester intentionally

violated his religious liberty," and "RLUI-PA provides a cause of action to redress this type of infringement." *Post* at 38. The dissent disagrees, however, with our decision to remand for further consideration of Lovelace's RLUIPA and constitutional claims against Warden Lee in his official capacity. A remand on these claims, especially the RLUIPA claim, is necessary to ensure that the prison satisfies its obligation—an obligation it has not yet attempted to meet—to justify the Ramadan policy's broad restrictions of religious liberty. The dissent nevertheless charges that we "use [ ] Keen Mountain's Ramadan policy as a platform from which to initiate an assault on state correction institutions" and that our "approach exhibits . . . distrust" of state prison officials. *Post* at 46–47. These statements are a harsh indictment, but we trust the dissent will be alone in thinking them to be true. Our directions come straight from RLUIPA, which Congress enacted because it found that some prisons have restricted religious liberty "in egregious and unnecessary ways." 146 Cong. Rec. S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy). Thus, according to RLUIPA, when a prison substantially burdens an inmate's exercise of religion, the prison must demonstrate that imposing the burden serves a compelling government interest and does so by the least restrictive means. With respect to Lovelace's claim against the warden, the thrust of our remand simply requires Keen Mountain to make that demonstration. We confirm emphatically that any substantive explanation offered by the prison *must be* viewed with due deference, notwithstanding the dissent's claim that we have abandoned "even the pretense of deference," *post* at 214.

I.

A.

On September 22, 2002, Warden Lee issued a policy to accommodate Keen Mountain inmates seeking to fast during the holy month of Ramadan. Observant Muslims fast between dawn and sunset during the thirty days of Ramadan. According to the warden's policy, inmates approved to participate in the fast received special pre-dawn (5:00 to 5:50 a.m.) and post-sunset (6:00 to 7:30 p.m.) meals in two dining halls reserved for fasting inmates of various Islamic denominations: Dining Hall # 1 for "World Community of Islam" inmates and Dining Hall # 2 for Nation of Islam (NOI) inmates.[1] J.A. 27. Prayer services were held either before or after the special breakfast meal in each reserved dining hall. Because participating inmates were expected to adhere to the rules of the fasting period as outlined by the World Community and NOI, they could not eat the regular cafeteria meals offered during the daytime. Warden Lee instructed security and food service staff to submit an incident report on any fast participant seen taking a meal tray during daylight hours. Any inmate who violated the policy would be removed from the Ramadan observance pass list, which meant that he would be barred from participating in the fast and, by extension, the morning prayer sessions. In 2002 the month of Ramadan extended from November 5 through December 4.

Lovelace, an NOI member and NOI liaison at Keen Mountain, was among approximately seventy NOI inmates approved to participate in the 2002 Ramadan fast. As

---

**1.** The phrase "World Community of Islam" in the policy presumably refers to the worldwide Muslim community, of which the two main sects are Sunni and Shi'a. NOI is a denomination founded in the United States that considers itself a form of Islam.

NOI liaison, he had met with prison staff before the fast began to discuss the Ramadan menu and propose possible menu alternatives. For example, he suggested the substitution of real juice for Kool–Aid because Kool–Aid is "an artificial drink which is in direct conflict with the teachings of [the Islamic] faith." J.A. 144. Prison officials rejected these suggestions. At breakfast on November 11, roughly six days into the fast, Lovelace and other fast participants discovered that "the milk being served [to them] was beyond its stamped expiration date." J.A. 17. As NOI liaison, Lovelace informed the kitchen staff about the inmates' "refusal to accept the expired milk." *Id.* The breakfast staff then replaced the seventy to seventy-five individual servings of expired milk with fresh milk. Lovelace describes his interaction with staff as "contentious" and notes that Correctional Officer Lester was the security officer assigned to the kitchen that morning. J.A. 181. Roughly twelve hours later, Lovelace was refused his special evening meal. He was informed that he had been removed from the pass list because, according to an incident report submitted by Officer Lester, he had taken a lunch tray at approximately 12:35 that afternoon, November 11. (The incident report is not in the record, and Lovelace has never seen it.)

Lovelace filed two emergency grievances that evening and two the following morning, asserting that he had not received a lunch tray and had not even entered the dining hall during fasting hours on November 11. The staff denied each of these grievances within several hours on grounds (1) that the grievances did not meet the definition of "emergency" (immediate risk of serious personal injury or irreparable harm) and (2) that Lovelace should instead "address any further complaints" by using the "inmate complaint/request" system. J.A. 37–40. On November

12 Assistant Warden Shinault formally notified Lovelace in writing that he was barred from "participation in Ramadan" because of his infraction the previous day. J.A. 36. Proceeding as he had been instructed, Lovelace filed a complaint with Mike Shaw, the treatment program supervisor, on November 12 or 13. Shaw or his colleague responded on November 13 that "[t]his [matter] will be left to the Chaplain." J.A. 35. Lovelace filed two additional complaints, one with the warden and one with the assistant warden, on November 13. Lovelace emphasized in the complaints, as he had in the emergency grievances, that he was being denied his right to participate in the Ramadan observance.

On November 14 Lovelace met with Shinault and Shaw and suggested that they review certain evidence to correct Lester's misidentification and reinstate Lovelace to the Ramadan pass list. This evidence included cafeteria security (surveillance) tapes from the afternoon of November 11 and as many as twenty witnesses who were willing to attest that Lovelace had never left the housing unit during lunchtime that day. Shinault told Lovelace that before ruling on the complaint, he would meet with Lester and show him Lovelace's "face card," a photograph kept on file for every inmate, "to confirm Lester's identification of [Lovelace]." J.A. 79. The following day, November 15, Shinault summoned Lovelace to a meeting and reiterated that Lovelace was ineligible to participate in the Ramadan program because of Lester's report, which Lester had "verified" (that is, confirmed). J.A. 34. Shinault, however, had not shown Lester the face card as he had said he would. Nor had he reviewed the security tapes or interviewed witnesses, as Lovelace had urged.

Lovelace filed a formal grievance on November 20 or 21, 2002. Warden Lee re-

sponded in a letter dated December 4 (the last day of Ramadan) that Lovelace's grievance was "unfounded." J.A. 30. The warden's letter stated that two officers had spoken with Lester, who said he was "positive that it was [Lovelace] that he observed" eating a non-Ramadan meal. J.A. 30. Lovelace appealed this Level I response to the regional director, asserting that prison officials and staff had failed to respond in a timely and judicious manner and thereby caused him irreparable injury. Regional Director Larry Huffman upheld Warden Lee's Level I decision with minimal comment. Huffman's Level II response was dated January 4, 2003, one month after the end of Ramadan. Thus, Lovelace was prevented from fasting and participating in the NOI congregational prayers for twenty-four of Ramadan's thirty days, from the evening of November 11 through the evening of December 4, 2002.

### B.

Having exhausted his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), Lovelace filed an action in the U.S. District Court for the Western District of Virginia on June 25, 2003. In his *pro se* complaint Lovelace alleged that Warden Lee, Assistant Warden Shinault, and Officer Lester violated his First Amendment free exercise rights, his Fourteenth Amendment due process rights, and his statutory rights under RLUIPA, 42 U.S.C. §§ 2000cc *et seq.* Lovelace sought a declaratory judgment, injunctive relief, punitive damages, damages for emotional distress and other injuries, and the appointment of counsel. The complaint, read in its entirety, indicates that Lovelace sued Lester in his individual capacity and sued Lee and Shinault in their official and individual capacities.

Shinault and Lester moved for summary judgment on September 10, 2003, before Lee was served with process. They attached to their motion an unexecuted affidavit from Lester. In this affidavit Lester acknowledged for the first time—more than nine months after the end of Ramadan—that he had misidentified another inmate as Lovelace. Lester said that the inmate who took the lunch tray on November 11, 2002, "resembled another inmate named Lovelace, who was no longer at the institution," and that he only realized this mistake "after the fact." J.A. 60. In his response Lovelace challenged Lester's affidavit for being "unsigned and unnotarized" and therefore inadmissible in summary judgment proceedings. J.A. 66–67. In addition, Lovelace submitted evidence to discredit the affidavit's contents. This evidence included (1) a staff member's statement, based on a data search, that no other inmate named Lovelace had been housed in the prison in the five years prior to September 22, 2003, and (2) Lovelace's own statement, made under penalty of perjury, that a "deeper search revealed no other Lovelace ever detained at [the Keen Mountain] facility." J.A. 68 n. 1. Lovelace further asserted that Lester's account of innocently mistaking his identity was incredible because Lester was familiar with Lovelace. In particular, Lester participated in a shakedown of Lovelace's cell (with Lovelace present) about six months prior to November 11, 2002; Lester on many occasions monitored the "chow hall line where ... [Lovelace had] verbally identified himself" from a distance of roughly two feet; Lester had "numerous instances of incidental interaction with [Lovelace] in the course of normal daily inmate movement"; and Lester worked for three months in the control booth in Lovelace's housing unit. J.A. 69, 78.

On October 17, 2003, Lester submitted a second, executed affidavit in which he still

admitted misidentifying Lovelace but changed his explanation. Instead of saying that he had confused Lovelace with another inmate named Lovelace who was no longer at the prison, Lester claimed that he had made an "honest ... mistake[ ]" by confusing Lovelace with "another inmate at the institution that looked like Lovelace." J.A. 159. Lester acknowledged that several inmates had "come to [him]" during Ramadan (as early as November 12, 2002, according to Lovelace's evidence) to dispute the identification, insisting that Lovelace had remained in his housing unit during the entire lunch period on November 11, 2002. *Id.* Yet Lester again alleged, as he had in his first affidavit, that he did not realize his mistake until "after Ramadan was over," when "someone pointed inmate Lovelace out to [him]." *Id.* Lovelace objected to Lester's second affidavit on grounds that it was untimely and "wholly different" from the first. J.A. 116. The district court took the second affidavit into consideration over Lovelace's objection.

In the meantime, Lovelace made several unsuccessful attempts to locate and serve process on Lee, who was no longer Warden at Keen Mountain and no longer employed by the Virginia Department of Corrections. U.S. Marshals ultimately served Lee on February 18, 2004, although it is "unclear ... whether ... [he] was served with a summons directing his response to the complaint." J.A. 97. Lee did not respond, and marshals served him again on May 4, 2004. Lee did not respond within the time allowed and on May 28 moved for an enlargement of time, which Lovelace opposed. Before the district court ruled on this motion, Lee filed a motion for summary judgment that paralleled and incorporated by reference Shinault and Lester's earlier motion. Lovelace countered that Lee had defaulted and therefore lacked standing to move for summary judgment. The district court granted Lee's motion for enlargement of time, deemed his summary judgment motion to be timely filed, and denied Lovelace's motion for a default judgment.

The district court granted summary judgment to Lee, Shinault, and Lester on September 13, 2004. The court concluded that the defendants were entitled to qualified immunity on the RLUIPA claim and that "no constitutional violation occurred in relation to the free exercise claim [because] the actions of defendants were negligent rather than intentional." J.A. 168. The court did not address Lovelace's due process claim. Lovelace filed a timely appeal and was subsequently assigned counsel.

## II.

### A.

We first consider Lovelace's RLUIPA claim. Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that ... interest." Religious Land Use and Institutionalized Persons Act of 2000, § 3(a), 42 U.S.C. § 2000cc–1(a). "Government" includes any official of a "State, county, municipality, or other governmental entity created under the authority of a State" and any other person "acting under color of State law." 42 U.S.C. § 2000cc–5(4)(A). Once "a plaintiff produces prima facie evidence to support a claim alleging a violation" of RLUIPA, "the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall

bear the burden of persuasion on whether [the challenged practice or law] substantially burdens the plaintiff's exercise of religion." *Id.* § 2000cc–2(b). In particular, the government must prove that the burden in question is the least restrictive means of furthering a compelling governmental interest. *Id.* § 2000cc–1(a).

■ Congress crafted RLUIPA in response to Supreme Court decisions holding that laws of general applicability that incidentally burden religious conduct do not offend the First Amendment. *See Madison v. Riter*, 355 F.3d 310, 314 (4th Cir. 2003) (discussing *Employment Division v. Smith*, 494 U.S. 872, 890, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)). In these decisions the Supreme Court "openly invited the political branches to provide greater protection to religious exercise through legislative action." *Id.* at 315 (citing *Smith*, 494 U.S. at 890, 110 S.Ct. 1595). Congress did just that by passing RLUIPA, mandating a "more searching standard" of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness. *See Madison*, 355 F.3d at 314–15 n. 1; *Freeman v. Texas Dep't of Criminal Justice*, 369 F.3d 854, 857–58 n. 1 (5th Cir.2004). In addition to prescribing strict scrutiny, Congress mandated that RLUIPA be construed "in favor of broad protection of religious exercise." 42 U.S.C. § 2000cc–3(g). Congress, in other words, "intended to provide as much protection as possible to prisoners' religious rights" without overly encumbering prison operations. *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 987 (8th Cir.2004); *see also Cutter v. Wilkinson*, 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (noting that lawmakers supporting RLUIPA "anticipated that courts would apply the Act's standard with due deference to the experi-

ence and expertise of prison and jail administrators").

■ RLUIPA's heightened protection stemmed from Congress's recognition that the right of inmates (and other institutionalized persons) to practice their faith is "at the mercy of those running the institution." 146 Cong. Rec. S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy). As the Supreme Court has stressed, inmates are subject to "a degree of [governmental] control unparalleled in civilian society and severely disabling to private religious exercise." *Cutter*, 544 U.S. at 720–21, 125 S.Ct. 2113. Congress thus passed RLUIPA to afford this confined population greater protection of religious exercise than what the Constitution itself affords.

■ Section 3 of RLUIPA, which protects institutionalized persons, applies to programs or activities that receive federal financial assistance. 42 U.S.C. § 2000cc–1(b)(1); *see also Cutter*, 544 U.S. at 715–16, 125 S.Ct. 2113. Because the Virginia Department of Corrections (VDOC) receives federal monies, section 3 applies to Keen Mountain and to the defendants who are state officials or actors employed there. 42 U.S.C. § 2000cc–1(b)(1); *see Madison*, 355 F.3d at 314 (noting that VDOC received $4.72 million from the federal government in 2002).

1.

■ Lovelace argues that his inability to observe Ramadan for twenty-four of its thirty days—specifically, his inability to fast during day-light hours and to attend NOI congregational prayers and services—imposed a substantial burden on his religious exercise. RLUIPA broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

Lovelace's observance of Ramadan, the Islamic holy month of fasting and prayer, qualifies as "religious exercise" under this definition. *See Adkins v. Kaspar,* 393 F.3d 559, 567–68 (5th Cir.2004) (holding that Sabbath and holy day activities "easily qualify as 'religious exercise' under ... RLUIPA's generous definition").

We next consider whether the burden was substantial. RLUIPA itself does not define "substantial burden," but the Supreme Court has defined the term in the related context of the Free Exercise Clause. According to the Court, a "substantial burden" is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), or one that forces a person to "choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion ... on the other hand," *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Following this model, several other circuits have articulated generally consistent definitions of "substantial burden" under RLUIPA. *See, e.g., Adkins,* 393 F.3d at 570 (defining it as a burden that "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs"); *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1227 (11th Cir.2004) ("result[ing] from pressure that tends to force adherents to forego

religious precepts or ... [tends to] mandate[ ] religious conduct"); *San Jose Christian Coll. v. City of Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir.2004) ("a significantly great restriction or onus upon [religious] exercise"); *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir.2003) ("[a burden] that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable"). We likewise follow the Supreme Court's guidance in the Free Exercise Clause context and conclude that, for RLUIPA purposes, a substantial burden on religious exercise occurs when a state or local government, through act or omission, "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas,* 450 U.S. at 718, 101 S.Ct. 1425.[2]

Lovelace's removal from the Ramadan observance pass list at Keen Mountain qualifies as a substantial burden under RLUIPA. Once removed from the pass list, Lovelace was excluded from special (pre-dawn, post-sunset) Ramadan meals and therefore could not fast during daylight hours. Unable to fast, he could not fulfill one of the five pillars or obligations of Islam. Moreover, during twenty-four of the thirty days of the holy month of Ramadan, he could not participate in NOI group prayers or services held in the dining hall before or after the special breakfast meal. This deprivation is critical because prior to Ramadan the prison accommodated NOI

---

**2.** In assessing this burden, courts must not judge the significance of the particular belief or practice in question. RLUIPA "bars inquiry into whether [the] belief or practice is 'central' to a prisoner's religion." *Cutter,* 544 U.S. at 725 n. 13, 125 S.Ct. 2113; *see* 42 U.S.C. § 2000cc–5(7)(A) (defining "religious exercise" to include "any exercise, whether or not compelled by, or central to, a system of religious belief"). RLUIPA does not, howev-

er, preclude inquiry into "the sincerity of a prisoner's professed religiosity." *Cutter,* 544 U.S. at 725 n. 13, 125 S.Ct. 2113; *cf. Gillette v. United States,* 401 U.S. 437, 457, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) ("The 'truth' of a belief is not open to question; rather, the question is whether the objector's beliefs are 'truly held.' ") (internal quotation marks and citation omitted). There is no dispute that Lovelace sincerely holds his religious beliefs.

inmates by allowing them to attend weekly NOI services. These services were cancelled during Ramadan when the policy was in effect. Thus, when the dissent says that the Keen Mountain "policy [is] clearly a religious accommodation rather than a burden," *post* at 207, it overlooks the fact that the policy works to restrict the religious exercise of any NOI inmate who cannot or does not fast, but who still wishes to participate in group services or prayers.[3]

 We have not, as the dissent argues, "taken it upon [ourselves] to create a claim for" Lovelace that the policy imposes a substantial burden on religious exercise. *See post* at 205. Lovelace filed his papers *pro se* in district court, but he needs no help from us in articulating his substantial burden claim. He accurately points out that once an inmate is removed from participation in the Ramadan fast under the policy, the policy automatically bars him from participation in congregational religious exercises, such as NOI services and group prayers. The dissent appears to sanction this wholesale removal from group religious exercise by saying that "[t]he breaking of the Ramadan fast suggests a lack of genuine interest in any Ramadan activity," including group prayers. *Post* at 213. We recognize, of course, that "prison officials may appropriately question whether a prisoner's religiosity, asserted as a basis for a requested accommodation [here, pre-dawn and post-sunset meals to allow daytime fasting], is authentic." *Cutter*, 544 U.S. at 725 n. 13, 125 S.Ct. 2113. An inmate, however, could decide not to be religious about fasting and still be religious about other practices, such as congregational services or group prayer. Such an inmate's right to religious exercise is substantially burdened by a policy, like the one here, that automatically assumes that lack of sincerity (or religiosity) with respect to one practice means lack of sincerity with respect to others. RLUIPA does not permit either prison administrators or courts to make such a blanket assumption. *See* 42 U.S.C. § 2000cc–5(7)(A) (providing protection for "*any* exercise of religion") (emphasis added); *see also Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir.1988) (recognizing "the fact that a person [who] does not adhere steadfastly to every tenent of his faith" may still be sincere about participating in some religious practices).

It makes no difference to this analysis that the burden on Lovelace's religious exercise resulted from discipline (punishment for his alleged infraction), rather than from the prison's failure to accommodate his religious needs in the first instance. *See McEachin v. McGuinnis*, 357 F.3d 197, 204 (2d Cir.2004) ("Courts have . . . found free exercise violations in cases where generally applicable prison policies were designed to accommodate inmates' religious dietary requirements, but the same allowances were not made for inmates subjected to disciplinary restrictions."); *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1211–14 (10th Cir.1999) (upholding district court's determination that denial of special Ramadan meals to inmate confined in punitive segregation violated

---

3. The dissent is off course in stating that the policy here "goes admirably beyond the policies that other courts have upheld." *Post* at 209. Most of the cases relied on by the dissent, *post* at 208–209, merely mention Ramadan policies in passing, they do not uphold them. Moreover, the challenges in the only two cited cases in which Ramadan policies

were upheld were brought under the First Amendment. *See Brown–El v. Harris*, 26 F.3d 68, 69 (8th Cir.1994); *Tisdale v. Dobbs*, 807 F.2d 734, 736 (8th Cir.1986). As even the dissent acknowledges, *post* at 219, the inquiry under RLUIPA is more rigorous than under the First Amendment.

Free Exercise Clause). The dissent quarrels with our use of the word "punishment" to describe the action taken against Lovelace by the prison when it concluded, in the defendants' words, that Lovelace "flout[ed] prison rules" established to accommodate the Ramadan observance. J.A. at 57. Regardless of how Lovelace's removal from the Ramadan pass list is characterized, our point is that RLUIPA's protections may apply even though Lovelace's alleged rule infraction triggered his wholesale exclusion from group religious observances and exercises.

The dissent argues that there can be no substantial burden here because the Keen Mountain Ramadan policy simply combines two religious exercises into one "event" or observance, "a [pre- or post-fast] meal accompanied by prayers." *Post* at 208. This argument ignores a critical fact emphasized above: during Ramadan the prison cancelled regular NOI services and precluded other gatherings for group prayer. Thus, as Lovelace spells out in his own words: when he was removed from the pass list, "he was effectively prohibited from exercising his religious beliefs because he was not permitted to fast, not permitted to attend NOI religious services, not permitted to attend Friday [Jumu'ah] services, and not permitted to participate in group prayers." J.A. 73 (punctuation and numbering omitted). The policy was therefore arranged and written so that disqualification from participation in one religious exercise (the fast) meant that normal avenues for communal worship (group services and prayers) at the prison became unavailable automatically. When this broad disqualification aspect of the policy was applied to Lovelace, he was forced to "significantly modify his religious behavior," *Adkins,* 393 F.3d at 570, and his RLUIPA right to religious exercise was substantially burdened. Expecting prison officials to recognize that the denial of routinely allowed religious exercises is a burden should not "drive [them] crazy" or "exceed [their] knowledge or understanding" of religious practices, as the dissent claims will be the case. *Post* at 209.[4]

The dissent would excuse the burdensome or restrictive aspects of the policy from any scrutiny because the purpose of the policy was to allow inmates, under a prescribed program, to observe Ramadan. But a policy can have a laudable purpose, as this one did, and still impose a substantial burden on religious exercise, as this one did in Lovelace's case. That does not end the RLUIPA analysis, however, because the policy's burdens or restrictions could be justified by compelling considerations of security or good order. The prison will therefore have the opportunity to present its rationale on remand, as we make clear in the discussion that follows.

## 2.

Because Lovelace has demonstrated that he suffered a substantial burden on his religious exercise, the burden shifts to the defendants to show that the Ramadan policy's strict (and broad) removal provision is the least restrictive means of furthering a compelling governmental interest. " 'Context matters' " in applying this "compelling governmental interest" standard. *Cutter,* 544 U.S. at 723, 125 S.Ct. 2113 (quoting *Grutter v. Bollinger,* 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003)). Courts should apply

---

4. Our conclusion that Lovelace's religious exercise rights were substantially burdened when the application of the policy barred him from congregational services and prayers is not remotely akin to a court "second-guessing prisons' determinations as to each subset of each inmate's particular religious practices." *Post* at 209. Again, our analysis deals with established practices well known to the prison authorities.

this standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* at 723, 125 S.Ct. 2113 (quoting joint statement of Sen. Hatch and Sen. Kennedy, RLUIPA's co-sponsors); *see also Murphy*, 372 F.3d at 987–88 (discussing legislative history). Of these enumerated concerns, security deserves "particular sensitivity." *Cutter*, 544 U.S. at 722, 125 S.Ct. 2113. RLUIPA, in other words, is not meant to "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id.*

The dissent charges repeatedly that we ignore our own "exhortation[ ] . . . [to give] due deference to the experience and expertise of prison and jail administrators." *Post* at 211. (Quotation marks and citations omitted); *see also, e.g., post* at 211 (labeling majority's position as the "majority's no-deference approach" or the "majority's no-deference view"). While our approach does suggest that a court should not rubber stamp or mechanically accept the judgments of prison administrators, *see Shimer v. Washington*, 100 F.3d 506, 510 (7th Cir.1996), our approach underscores that those judgments must nevertheless be viewed through the lens of due deference. Here, the first job is to require Keen Mountain to take the unremarkable step of providing an explanation for the policy's restrictions that takes into account any institutional need to maintain good order, security, and discipline or to control costs. That explanation, when it comes, will be afforded due deference.

■ The defendants have not adequately demonstrated on this record that the Ramadan policy is the least restrictive means of furthering a compelling govern-mental interest. They assert simply a "legitimate interest in removing inmates from religious dietary programs where the inmate flouts prison rules reasonably established in order to accommodate the program." J.A. 57. They do not elaborate how this articulated "legitimate interest" qualifies as compelling; they do not present any evidence with respect to the policy's security or budget implications. *Cf. Makin*, 183 F.3d at 1213–14 (observing, in a First Amendment case, that prison policy denying Ramadan meals served no legitimate governmental interest owing to the lack of evidence that the policy served asserted interests in deterrence, rehabilitation, security, and cost saving). Given the superficial nature of the defendants' explanation, we cannot at this stage conclude that the asserted interest is compelling as a matter of law.

The dissent contends that we "fail[ ] to recognize [the] compelling governmental interest[s]" here. *Post* at 211. Specifically, we are faulted for failing to appreciate matters such as "the number of inmates Keen Mountain prison administrators supervise, the budgetary restrictions they labor under, the staffing problems they encounter," *post* at 210, or what risks they face in controlling the prison dining rooms and releasing inmates from their cells before dawn and after dark. We discuss none of these matters because none of them are advanced by the prison in the policy or elsewhere as justifications for the policy's burdens on religious exercise. In short, the dissent's assertion that the Ramadan policy was "enacted with safety and security considerations front and center," *post* at 211, is not verified by any statement placed into the summary judgment record by a Keen Mountain official. This shortcoming distinguishes this case from *Beard v. Banks*, 548 U.S. ——, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006) (plurality),

which the dissent cites to suggest that we are not deferring to the judgment of the prison officials. *See post* at 204, 211. The plaintiff-inmate in *Beard* brought a First Amendment challenge against a prison policy that denied newspapers and other materials to a group of dangerous and recalcitrant inmates. There, a thorough official explanation of the penological rationales for the policy led the Supreme Court to defer to the prison authorities on the summary judgment record. Specifically, in *Beard,* where the prison had only to show a "legitimate interest," the deputy prison superintendent had provided an undisputed deposition and affidavit explaining, among other things, why "the regulations do, in fact, serve the [penological] function identified." *Beard,* 126 S.Ct. at 2579. Here, in contrast, where RLUIPA requires the prison to show a "compelling interest," we have no sworn statement from the warden, the assistant warden, or any other prison official that discusses any security, safety, or cost consideration that justifies the restrictions in the Ramadan policy. That is the fundamental problem presented in this appeal, and it cannot be solved, as the dissent would solve it, by a court suggesting on its own the governmental interest that might be present.

The dissent also argues that the policy's restrictions on religious exercise justify themselves because the policy itself has explicit security procedures for "keeping track of inmates and their out-of-cell-activities" as they participate in the Ramadan program. *Post* at 212–213. The inclusion of details in the policy for its orderly and safe execution, however, does not explain why the prison had a compelling basis for eliminating a prisoner's access to established congregational services because of an asserted failure to observe the fast.

RLUIPA assigns to the prison the burden of proving that the policy's restrictions further a compelling governmental interest. 42 U.S.C. § 2000cc–2(b). If the dissent's assumptions about the governmental interests involved here had been included in an affidavit by the warden or some other Keen Mountain official, the district court would have been presented with a different case on summary judgment. But, as matters stand, we are doing nothing more than requiring the prison to meet its burden under RLUIPA.

Even if we assume that the asserted governmental interest is compelling, the defendants have not shown that the policy, more precisely its removal provision, is the least restrictive means of furthering this interest. The removal provision is far reaching in that it excludes inmates not only from the special Ramadan meals but also from the Ramadan prayer services held in the dining hall immediately before or after the morning meal. An NOI inmate, such as Lovelace, had no other options for congregational worship. Regular NOI Friday services were cancelled by the prison during Ramadan. Moreover, Lovelace could not attend any related Muslim services as a substitute for NOI services during the thirty-day span. The prison prohibits inmates from attending more than one religious group's services in a calendar quarter. Because Lovelace had signed up for NOI services, he could not attend Friday Jumu'ah (Muslim) services as an alternative to the daily NOI prayers. To the extent that the removal provision prohibits both special meal and group prayer access, the prison Ramadan policy is arguably not the least restrictive means of furthering the asserted governmental interest. Thus, at this stage, the defendants have not demonstrated that the pris-

on policy satisfies the strict requirements of RLUIPA.[5]

■ The dissent contends that the remand we order turns "the least restrictive means test [into] a tool by which lower courts may endlessly second-guess prison officials." *Post* at 214. To the contrary, we instruct the district court to do what RLUIPA commands: assess with due deference any explanation by the prison as to why denying an inmate who breaches the fast the opportunity to participate in other religious observances is the least restrictive way to deal with a compelling problem. There is no basis in this case for a court to do what the dissent urges, that is, to declare the least restrictive means test satisfied without any substantive explanation from prison officials.[6]

We pause to emphasize that our decision today will not, as the dissent predicts, "thrust [the federal courts] into a role ... of micromanaging state prisons." *Post* at 204. We also emphasize that the dissent's approach of coming up with its own justification for the Ramadan policy's burdens on free exercise essentially exempts prison administrators from RLUIPA's requirements. To begin with, the dissent's argument that our decision will thrust courts into the middle of prison management is repeated and, indeed, pressed to the point that it calls itself into question. *See, e.g., post* at 204 ("the majority has turned [RLUIPA] into an administrative nightmare for the state penal institutions"); *id.* ("the majority subjects even the most progressive of policies to the most intrusive judicial supervision"); *post* at 204 ("the majority's remand ... is [ ] an invitation to finetune prison policy from the judicial perch"); *post* at 205 ("the majority transforms [RLUIPA] into an administratively unworkable ... quagmire"); *post* at 210 ("the majority's no-deference approach is synonymous with federal court control of routine prison policy"); *post* at 211 ("the majority ... invites lower courts to substitute their own judgment for that of prison

5. The dissent worries that our remand for the district court to apply RLUIPA's standard—whether the policy is the least restrictive means of furthering a compelling prison interest—offers no guidance to district courts. *Post* at 53. This worry is a needless one because courts are well acquainted with the standard and its application. It has been applied in cases involving constitutional and statutory free exercise claims for decades. *See, e.g., Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

6. The dissent sees constitutional peril in what it claims is our "desire to accommodate Lovelace ... individually," *post* at 215, and predicts that under our approach "accommodation may devolve into an unlawful fostering of religion" in violation of the Establishment Clause, *post* at 216 (quoting *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos,* 483 U.S. 327, 334–35, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987)). Specifically, the dissent suggests that under our interpretation of RLUIPA's narrow tailoring requirement, prison grievance procedures might have to be reconfigured to provide official decisionmaking on varying schedules that adjust "to the timing and duration of different religious observances." *See post* at 216. We do not doubt our dissenting colleague's sincerity in raising this concern, but we respectfully suggest that he is too quick on the draw in this instance. It is premature and unnecessary to evaluate any remedy at this juncture because liability has not yet been considered, let alone decided, under the proper standard. We are confident that no Establishment Clause concerns are raised by a remand that requires Keen Mountain to explain its policy under the least restrictive means standard prescribed in section 3 of RLUIPA, 42 U.S.C. § 2000cc–1(a)(2). After all, the Supreme Court has *held* "that § 3 of RLUIPA fits within the corridor between the Religion Clauses." *Cutter,* 544 U.S. at 720, 125 S.Ct. 2113. And, we are also confident that should this case proceed beyond the liability stage to the remedy stage, the district court will be mindful that any relief awarded must fit within that corridor.

officials"); *post* at 211 ("the majority's approach would soon draw federal courts into the minute details of penal institutions"); *post* at 215 ("the majority ... invites an open-ended and potentially wide-ranging inquiry into prison administration"); *id.* (the "remand is itself an instruction to the district court to delve into minute prison details"); *post* at 215 (the majority's "approach of remanding ... will have prison administrators chasing their tails" and permit "lower courts [to] endlessly second-guess prison officials"); and *post* at 218 ("the majority has placed federal courts at the center of daily prison policymaking").

Today's remand provides nothing akin to a license for courts to plunge into prison policymaking or prison management. We merely require that the prison itself explain in a responsive fashion why the Ramadan policy's burdens on religious exercise are justified under RLUIPA's standard. It is our dissenting colleague who delves into prison policymaking by coming up with his own reasons as to why the policy's restrictions are necessary to insure safety and security. If a court could, as the dissent would have it, offer explanations on its own, then prisons would be effectively relieved of their responsibilities under RLUIPA. Or what is more fundamental, court-generated explanations would cut severely against Congress's intent to provide inmates with greater protections in the area of religious exercise.

### 3.

The dissent insists that all potential culpability for Lovelace's total inability to participate in any form of communal religious observance during Ramadan lies with Officer Lester alone. But Lester did not cancel regular NOI services, nor did he decide that inmates not observing the fast would be not able to participate in group services. A prison official made these decisions, and these decisions must be measured against RLUIPA's standards. The Act's laudable goal of providing greater religious liberty for prisoners will be thwarted unless those who run state prisons—wardens and superintendents acting in their official capacities—satisfy their statutory duty. That duty is to ensure and demonstrate that a compelling government interest is present and the least restrictive means are used when an inmate's religious exercise is substantially burdened. Ordering a remand to give the appropriate Keen Mountain official the opportunity to make the required demonstration is not meant to punish the prison, as the dissent suggests. *See post* at 201. Rather, it is a directive for the prison official to do what Congress mandates in RLUIPA. If only prison guards are held to account, RLUIPA will never be a true "expression of our nation's commitment to religious freedom." *See id.* at 37–38.

### 4.

▮▮▮▮ Insofar as Lovelace purports to sue Lee and Shinault in their official capacities for issuing a policy whose text violates RLUIPA, there is a claim only against Lee. It was Warden Lee, not Assistant Warden Shinault, who issued the challenged policy as an official of the Commonwealth. For the reasons just discussed, Lovelace survives summary judgment on the merits of the official-capacity claim against Lee. On this claim, Lovelace seeks declaratory and injunctive relief as well as money damages. Damages are not recoverable on this claim because in another opinion filed today, our court holds that a state's Eleventh Amendment immunity from suit for damages is not waived in RLUIPA. *Madison v. Commonwealth of Va.*, No. 06–6266, 474 F.3d 118, 2006 WL 3823181 (4th Cir.2006)(*Madison II* ). The official-capacity claim against Lee will nev-

ertheless proceed because non-monetary relief is sought, and qualified immunity is not available. *See Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 306 (4th Cir.2006). We will therefore vacate the summary judgment for Lee on the RLUIPA claim against him in his official capacity.

### B.

### 1.

■ Having addressed Lovelace's claim that the policy as issued violates RLUIPA, we now consider his claim that the defendants applied the policy in violation of RLUIPA. Lovelace asserts this claim against the defendants in their individual capacities, not as officials of the Commonwealth. As noted above, RLUIPA liability exists only when a defendant (1) fits the statutory definition of "government" (which includes state officials and those acting under color of state law) and (2) imposes a "substantial burden" on an inmate's religious exercise without compelling justification. The defendants meet the definition of "government," and they arguably imposed a substantial burden without compelling justification when they barred Lovelace from Ramadan observance and other religious exercise, as indicated earlier. To hold the defendants liable as individuals, Lovelace must further prove that they acted with the requisite intent. Although RLUIPA itself contains no state-of-mind standard, a fault requirement consistent with Congress's purpose must be incorporated from customary tort principles. Of course, tort law's spectrum of fault ranges from negligence to intentionality.

We conclude that simple negligence, the "lowest common denominator of customary tort liability," does not suffice to meet the fault requirement under section 3 of RLUIPA. *County of Sacramento v. Lewis*, 523 U.S. 833, 848–49, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Adoption of the negligence standard would open prison officials to unprecedented liability for burdening an inmate's religious exercise. The landscape of liability for prison officials is determined, in large part, by constitutional provisions. "[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold" of constitutional protections. *Id.* at 849, 118 S.Ct. 1708. In such terrain, it would be a very long step to sanction negligence suits under RLUIPA. As we observed in *Pink v. Lester*, 52 F.3d 73, 77 (4th Cir.1995), a due process and First Amendment case: "Absent a contrary instruction from Congress, we are reluctant to increase the already steady stream of litigation produced in [the prison] setting by sanctioning negligence suits that serve no constitutional ends." This expression of reluctance applies with equal force to RLUIPA cases because, as the Supreme Court explained, "[l]awmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions." *Cutter*, 544 U.S. at 723, 125 S.Ct. 2113. Congress intended for RLUIPA to be applied "in an appropriately balanced way," with "due deference to the experience and expertise of prison and jail administrators." *Id.* (internal quotation marks omitted).

Allowing negligence suits to proceed under RLUIPA would undermine this deference by exposing prison officials to an unduly high level of judicial scrutiny.

Turning from the low end to the high end of the culpability spectrum, we conclude that RLUIPA at least reaches intentional conduct because that is what the Free Exercise Clause reaches. *See Employment Div. v. Smith*, 494 U.S. at 890, 110 S.Ct. 1595; *Shaheed v. Winston*, 885

F.Supp. 861, 868 (E.D.Va.1995). As we said earlier, Congress passed RLUIPA to give institutionalized persons greater protection of religious exercise than what the Constitution affords. Because the Constitution prohibits intentional burdens on free exercise, RLUIPA must, at a minimum, prohibit these burdens as well. Here, Lovelace alleges that the defendants' conduct was intentional. We therefore need not decide today whether RLUIPA reaches beyond the Free Exercise Clause to prohibit conduct, such as deliberate indifference, that is less than intentional but more than negligent.

2.

■ Lovelace presents enough evidence of culpability to survive Officer Lester's motion for summary judgment on the RLUIPA claim. The evidence raises a genuine question whether Lester acted intentionally in depriving Lovelace of his free exercise rights.

Lester was the correctional officer on duty during Lovelace's contentious confrontation with kitchen staff over the expired milk on the morning of November 11, 2002. Later that day, Lester submitted an incident report wrongly identifying Lovelace as receiving a lunch tray. As Ramadan dwindled away over the next several weeks, Lester repeatedly insisted that he had seen Lovelace take a lunch tray when questioned by Assistant Warden Shinault, fellow officers, and inmates. He never once wavered, even when faced with evidence from other inmates that he might have erred. It was not until he faced a lawsuit in September 2003, more than nine months after the end of Ramadan, that Lester finally admitted his error. He submitted two affidavits (the first unexecuted) in September and October 2003 giving inconsistent explanations for his error. He first claimed that he had mistakenly identi-

fied an inmate who resembled *another* Keen Mountain inmate named Lovelace. Lovelace, in a verified response, asserted that a data search revealed that no other inmate named Lovelace had ever been housed at the facility. Lester then submitted his second affidavit, changing his explanation to state that he had simply confused Lovelace with another inmate. *Cf. Vathekan v. Prince George's County,* 154 F.3d 173, 180 (4th Cir.1998) (noting that contradiction between witness's sworn and unsworn statements "creates a question about his credibility").

As it turns out, Lester was familiar with Lovelace when he made what he claimed was an honest mistake by misidentifying him. Lester had searched Lovelace's cell in Lovelace's presence approximately six months prior to the Ramadan incident on November 11, 2002, and he had often monitored the chow hall line where Lovelace was required to identify himself at close range. In addition, Lester had worked in the control booth in Lovelace's housing unit, and the two had had routine interaction on many occasions. Even if Lester had been unfamiliar with Lovelace at the time of the incident and had been uncertain about the identification, he could simply have checked the suspect inmate's I.D. card in the cafeteria. Inmates carry I.D. cards with them at all times, and (according to Lovelace) it is "standard procedure for security personnel to demand of an inmate his I.D. card in order to retrieve the inmate's name and I.D. number prior to writing an incident report." J.A. 79. When questioned by fellow officers and inmates in the days following the incident, Lester could easily have checked Lovelace's face card on file or other evidence, such as cafeteria videotapes from the afternoon of November 11. Instead, Lester "refused even to entertain the possibility that he had mistakenly identified another inmate as Lovelace." J.A. 147.

This proffered evidence indicates intentional conduct, which is surely sufficient to establish fault under RLUIPA. A reasonable fact-finder could conclude that Lester acted intentionally, perhaps even maliciously, in misidentifying Lovelace and in failing to correct his error during the remainder of Ramadan 2002. We therefore hold that Lester is not entitled to summary judgment on the merits of the RLUIPA claim.

█ In contrast, Lovelace's evidence does not support a determination that Assistant Warden Shinault and Warden Lee acted with the requisite degree of culpability to be held liable in their individual capacities under RLUIPA. Shinault and Lee at most acted negligently by not reinstating Lovelace to the Ramadan pass list. Shinault met with Lovelace on November 14, listened to his grievances, and later that day or the next confirmed with Lester that he had indeed seen Lovelace retrieve the lunch tray on November 11. Although Shinault had promised Lovelace that he would show Lester a face card to confirm the identification, Shinault's failure to do so does not prove intent to deprive Lovelace of his religious exercise rights. It simply reveals that Shinault was satisfied with Lester's identification after Lester "again confirmed" that he had "seen [Lovelace] eating a [lunchtime] meal." J.A. 34, 79. Lee, in turn, reviewed the documents attached to Lovelace's grievance. He concluded that the grievance was "unfounded" based on this review and

the inquiries of two officers, who had earlier questioned Lester as a result of Lovelace's insistence that Lester had erred. Lester assured these officers that he was "positive" he had seen Lovelace eat a non-Ramadan meal. J.A. 30.

While Shinault's and Lee's efforts to ensure accuracy ultimately proved inadequate—the misidentification went uncorrected for months—they suggest only negligence, not intentional conduct with respect to Lovelace's religious exercise rights. That is, their decision to trust Lester's confirmation reflects at most a failure to take due care with respect to the risk that Lester was mistaken or deceptive. Summary judgment in favor of Shinault and Lee in their individual capacities was thus proper on the RLUIPA claim.

## C.

█ The question remains whether Officer Lester is entitled to summary judgment on qualified immunity grounds. Qualified immunity is an affirmative defense that shields public officers performing discretionary duties from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[7] Here, the district court erroneously granted Lester qualified immunity on the premise that

7. Lester has not raised (and we leave open) the issue of whether RLUIPA allows damages against state and local officials sued in their individual capacities. District courts are split on this question. *Compare Shidler v. Moore*, 409 F.Supp.2d 1060, 1071 (N.D.Ind.2006) (recognizing RLUIPA claims for individual money damages), *Charles v. Verhagen*, 220 F.Supp.2d 937, 953 (W.D.Wis.2002) (same), *Daker v. Ferrero*, No. 11:03–CV–02481–RWI, 2006 WL 346440, at *8 (N.D.Ga. Feb.13, 2006) (same), *and Orafan v. Goord*, No. 00CV2022, 2003 WL 21972735, at *9 (N.D.N.Y. Aug.11, 2003) (same) *with Gooden v. Crain*, 405 F.Supp.2d 714, 723 ("RLUIPA does not contemplate recovering damages from individuals[.]"), *Boles v. Neet*, 402 F.Supp.2d 1237, 1241 (D.Colo.2005) (same), *and Smith v. Haley*, 401 F.Supp.2d 1240, 1246 (M.D.Ala.2005) (expressing doubt as to whether RLUIPA authorizes individual damages).

there was uncertainty about RLUIPA's constitutionality at the time of the alleged violation.

We apply a two-step analysis in assessing whether qualified immunity is available. *See Saucier v. Katz*, 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). We first consider whether the facts alleged, taken in the light most favorable to Lovelace, show that Lester violated Lovelace's statutory rights under RLUIPA. Lovelace satisfies this part of the test, as our earlier discussion establishes. Second, we consider whether these statutory rights were clearly established at the time of the claimed violation. *See id.* For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Chronology and the origins of RLUIPA inform our analysis of whether the rights in question were clearly established at the time Lovelace was removed from the Ramadan pass list. RLUIPA was enacted in September 2000; the alleged violation occurred more than two years later, November and December 2002. RLUIPA was a modified version of the earlier RFRA, enacted in 1993, which the Supreme Court invalidated as it applied to states and localities with its decision in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). *See Madison*, 355 F.3d at 314–15 (discussing RFRA's partial invalidation and RLUI–PA's subsequent enactment). In passing RLUIPA, Congress "resurrected RFRA's language, but narrowed the scope of the act, limiting it to laws and regulations concerning institutionalized persons or land use." *Murphy*, 372 F.3d at 987. As an additional change, Congress "sought to avoid *Boerne's* constitutional

barrier by relying on its Spending and Commerce Clause powers, rather than on its remedial powers under section 5 of the Fourteenth Amendment as it had in RFRA." *Madison*, 355 F.3d at 315. Congress thereby aimed to avoid the constitutional problems that plagued RFRA. *See* 146 Cong. Rec. S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy). Even without this indication, RLUIPA, like all acts of Congress, carried a strong presumption of constitutionality. *See United States v. X–Citement Video, Inc.*, 513 U.S. 64, 73, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) ("[W]e do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution as construed by this Court."). Federal laws, in other words, do not need judicial approval to take effect and be clearly established. *See Schwenk v. Hartford*, 204 F.3d 1187, 1204 (9th Cir.2000) ("State officials are ... not entitled ... to ignore a new federal law in the hopes that a court will subsequently strike it down. If officials choose to ignore a federal law, they do so at their own peril.").

Section 3 of RLUIPA nonetheless encountered some hurdles before the Supreme Court declared it constitutional under the Establishment Clause in *Cutter v. Wilkinson*, 544 U.S. at 719–26, 125 S.Ct. 2113. Prior to that decision, the Fourth, Seventh, and Ninth Circuits had upheld the provision under the Establishment Clause while the Sixth Circuit had invalidated it. *Id.* at 718–19, 125 S.Ct. 2113.

The district court relied on one such circuit case, our decision in *Madison v. Riter*, 355 F.3d at 322, in ruling that Lester was entitled to qualified immunity. Citing *Madison*, the district court stated that RLUIPA "pose[s] difficult problems for constitutional scholars" and was therefore not clearly established law at the time of the alleged violation. J.A. 170. This

rationale is problematic for two reasons. First, we issued our opinion in *Madison* on December 8, 2003, more than a year after the alleged violation at Keen Mountain. (Indeed, all of the circuit court opinions cited in *Cutter* were decided after November 2002. 544 U.S. at 718, 125 S.Ct. 2113.) Second, we held that RLUIPA was constitutional in *Madison*, not unconstitutional; surely *Madison* cannot be grounds for questioning RLUIPA's constitutionality and status as a clearly established federal law. 355 F.3d at 322. It is true, as Lester points out, that our decision in *Madison* reversed the district court decision declaring the RLUIPA section incompatible with the Establishment Clause. *Madison v. Riter*, 240 F.Supp.2d 566, 582 (W.D.Va. 2003), *rev'd*, 355 F.3d 310 (4th Cir.2003). Yet even the district court opinion in *Madison*, decided January 23, 2003, came *after* the November 2002 incident here. In fact, no court had invalidated the provision before November 2002. Lester therefore cannot rely on the opinions that he cites, nor on *any* opinion invalidating the RLUIPA provision, in arguing that RLUIPA's constitutionality was unsettled at the time of the incident. *See Wilson v. Layne*, 141 F.3d 111, 117 (4th Cir.1998) (en banc), *aff'd*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (noting that reliance on decisions issued after the events underlying the litigation, whether issued by this court or others, is inappropriate for qualified immunity purposes). Once RLUIPA took effect, it carried a presumption of constitutionality. *See X–Citement Video,*

*Inc.*, 513 U.S. at 73, 115 S.Ct. 464. Lester should have proceeded as though RLUIPA was constitutional and conformed his conduct accordingly. *See Schwenk*, 204 F.3d at 1204.

The question still remains whether a reasonable prison guard should have known that the conduct attributed to Lester violated Lovelace's free exercise rights under RLUIPA. The inquiry of whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. The right, in other words, must be clearly established in a "particularized, and hence more relevant, sense." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. Although "[a] prior case holding identical conduct to be unlawful is not required" for the right to be clearly established, the unlawfulness of the conduct must be "manifest under existing authority." *Vathekan*, 154 F.3d at 179; *see also Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

Because the facts support an inference that Lester acted intentionally in depriving Lovelace of his free exercise rights, Lester is not entitled to summary judgment on qualified immunity grounds. Although the outer boundaries of RLUIPA may have been uncharted at the time, its core protections were not. As explained earlier, RLUIPA incorporates and exceeds the Constitution's basic protections of religious exercise.[8] Under both the Free Ex-

---

**8.** In its most basic protections, RLUIPA mimics the First Amendment. RLUIPA incorporates the "substantial burden" test used in First Amendment inquiries and expressly refers to the Free Exercise Clause in allocating its burden of proof. *See* 42 U.S.C. § 2000cc–2 ("If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of

section 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim" except the "substantial burden" element.). The primary difference, as explained earlier, is that RLUIPA adopts a "more searching standard" of review than that used for parallel First Amendment claims, strict scrutiny instead of reasonable-

ercise Clause and RLUIPA in its most elemental form, a prisoner has a "clearly established ... right to a diet consistent with his ... religious scruples," including proper food during Ramadan. *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir.2003); *see also McEachin*, 357 F.3d at 203–04 & n. 7 (collecting cases). A prison official violates this clearly established right if he intentionally and without sufficient justification denies an inmate his religiously mandated diet. *See Meyer v. Teslik*, 411 F.Supp.2d 983, 991 (W.D.Wis.2006). Thus, under both the First Amendment *and* any straightforward interpretation of RLUIPA, the unlawfulness of intentional and unjustified deprivations of Ramadan meals was apparent at the time of the incident.

Lester's state of mind is therefore critical to determining whether a reasonable person in his position would have understood that his conduct violated clearly established rights. If Lovelace succeeds in showing that Lester intentionally blocked his observance of Ramadan in violation of RLUIPA's basic protections, then Lester would not be entitled to qualified immunity. Because there is on this record a genuine issue of material fact as to whether Lester intentionally and purposefully infringed Lovelace's free exercise rights—rights clearly established at the time under RLUIPA *and* the First Amendment—Lester is not entitled to qualified immunity at this stage on the RLUIPA claim. *See Vathekan*, 154 F.3d at 179–80; *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir.1988).

## III.

We turn now to Lovelace's constitutional claims under the Free Exercise and Due Process Clauses. He brings these claims under 42 U.S.C. § 1983.

## A.

 Lovelace contends that the prison Ramadan policy violated his rights under the Free Exercise Clause. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Inmates "clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citation omitted). Inmates' constitutional rights must be evaluated within the context of their incarceration, however. The Supreme Court has long cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration." *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). "Running a prison is an inordinately difficult undertaking," and the task is "peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 84–85, 107 S.Ct. 2254. As a consequence, courts must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration. *O'Lone*, 482 U.S. at 349–50, 107 S.Ct. 2400; *Turner*, 482 U.S. at 84–85, 107 S.Ct. 2254. This deference is achieved in part through application of a reasonableness test that is less restrictive than the test ordinarily applied to alleged infringements of fundamental constitutional rights. *O'Lone*, 482 U.S. at 349, 107 S.Ct. 2400. A prison regulation that abridges inmates' constitutional rights is "valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. Thus, as noted earlier, the First Amend-

ness. *Madison*, 355 F.3d at 314–15 n. 1; *see* *also Freeman*, 369 F.3d at 857–58 n. 1.

ment affords less protection to inmates' free exercise rights than does RLUIPA. *See, e.g., Freeman,* 369 F.3d at 857–58 n. 1.

## 1.

■■■■ Lovelace alleges that the prison Ramadan policy "fail[s] to meet an objectively reasonable standard" as required under *Turner.* J.A. 21. Lovelace challenges the policy's broad removal provision, which reads: "Inmates who are observed at other meals will be removed from participation." J.A. 27. He focuses on the restrictions on religious exercise that flow from removal from the Ramadan program. These restrictions imposed a substantial burden on Lovelace's right to practice his religion, as we have made clear in part II.A.1., *supra. See also O'Lone,* 482 U.S. at 345, 107 S.Ct. 2400 (implicitly recognizing the substantial burden placed on Muslim prisoners by a policy that prevented them from attending weekly congregational services, but holding that prison regulations in question did not violate First Amendment). The defendants cannot justify restricting Lovelace's free exercise rights merely because he allegedly violated a rule and was subject to discipline. *See, e.g., McEachin,* 357 F.3d at 204–05; *Ford,* 352 F.3d at 597; *Makin,* 183 F.3d at 1213–14; *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989). Rather, a prisoner's free exercise rights may only be restricted by punitive measures to the extent that these measures are "reasonably adapted to achieving a legitimate penological objective." *Young,* 866 F.2d at 570. That is, the punitive measures must meet the reasonableness test set forth in *Turner.*

■■■■ The *Turner* test asks: (1) whether there is a "valid, rational connection" be-tween the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right ... remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns." *Turner,* 482 U.S. at 89–92, 107 S.Ct. 2254 (internal quotation marks and citations omitted).

■■■■ The district court never examined the *Turner* factors in granting summary judgment to the defendants. The court based its decision entirely on the defendants' state of mind, concluding that "no constitutional violation occurred in relation to the free exercise claim as the actions of defendants were negligent rather than intentional." J.A. 168. Asking whether the defendants acted with the requisite intent in implementing the policy does not, however, address whether the policy by its own terms violates the Free Exercise Clause. More precisely, it does not address Lovelace's claim against Lee for issuing the policy in his official capacity as Warden of Keen Mountain. We therefore vacate summary judgment in favor of Lee in his official capacity on the free exercise claim insofar as Lovelace seeks declaratory and injunctive relief.[9]

9. The dissent would affirm the dismissal of Lovelace's free exercise claim on the alternative ground that "the Ramadan policy impos-es no burden and ... it meets *Turner's* deferential test." *Post* at 60. A remand is more appropriate for obvious reasons. First, as al-

2.

We next consider the defendants' state of mind in removing Lovelace from the pass list and in failing to reinstate him. The district court rightly concluded that only intentional conduct is actionable under the Free Exercise Clause. To this end, the district court first noted that 42 U.S.C. § 1983, the basis for Lovelace's First Amendment claim, does not include an independent state-of-mind requirement. *See Daniels,* 474 U.S. at 329–30, 106 S.Ct. 662. Section 1983's state-of-mind requirement is instead controlled by the underlying constitutional right allegedly infringed. *See id.* at 330, 106 S.Ct. 662.

In *Daniels* the Supreme Court held that an official's negligent act does not implicate the Due Process Clause. *Id.* at 328, 106 S.Ct. 662; *see also Pink,* 52 F.3d at 75. The Court reasoned that the language and purpose of the Due Process Clause require a showing of "some measure of deliberateness," lest the Fourteenth Amendment become a " 'font of tort law to be superimposed upon whatever systems may already be administered by the States.' " *Pink,* 52 F.3d at 75 (discussing *Daniels* and quoting *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). In *Pink v. Lester* we indicated that this rationale would apply equally to the First Amendment "right to petition the government for redress of grievances," since the operative word "abridge" in the First Amendment closely parallels the operative word "deprive" in the Fourteenth Amendment, and in fact both words originally shared the same meaning. *Pink,* 52 F.3d at 76–77;

*see id.* at 76 ("Just as 'deprivation' suggests an intentional denial, an 'abridgement' connotes a conscious act [rather than a merely negligent one]."). Both *Pink* and *Daniels* arose in the prison context, and we stressed in *Pink* that absent a directive from Congress, courts should be wary of interfering with the operations of state penal institutions by "sanctioning[§ 1983] negligence suits that serve no constitutional ends" but impose substantial social costs (including unduly inhibiting government officials in their duties by increasing their fears of monetary liability). *Pink,* 52 F.3d at 77 (citing *Anderson,* 483 U.S. at 638, 107 S.Ct. 3034).

 The district court extended the analysis in *Daniels* and *Pink* to Lovelace's First Amendment free exercise claim, reasoning that the operative word "prohibit" in the First Amendment likewise connotes a "conscious act" rather than a merely negligent one. J.A. 171. Accordingly, the district court held that negligent interference with free exercise rights is not actionable under § 1983. We agree and hold that negligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause. *Accord Lewis v. Mitchell,* 416 F.Supp.2d 935, 942–44 (S.D.Cal.2005); *Shaheed,* 885 F.Supp. at 868. Lovelace must assert conscious or intentional interference with his free exercise rights to state a valid claim under § 1983.

 Although the district court imposed the proper state-of-mind requirement, it partially erred in finding that the

ready stated, the policy, through its broad restrictions on several forms of religious exercise, creates a substantial burden. Second, *Turner* at a minimum requires a deferential examination of the prison's rationale for the restrictions, but the prison has yet to come forward with any substantive rationale. The prison's rationale for the restrictions and any

facts relevant to the *Turner* factors should be presented to the district court in the first instance. *See Ford,* 352 F.3d at 596. Because we do not have "a proper record for review," Lovelace's free exercise claim will be remanded. *See Ross v. Commc'ns Satellite Corp.,* 759 F.2d 355, 363–64 (4th Cir.1985).

defendants' actions "resulted from negligence and not from intentional action." J.A. 171. The court correctly assessed the evidence against Shinault and Lee (in their individual capacities), but it underestimated the strength of the evidence against Lester. The facts, taken in the light most favorable to Lovelace, raise a genuine dispute whether Lester acted intentionally in depriving Lovelace of his free exercise rights. For this reason, summary judgment in favor of Lester on the First Amendment claim was error.

In sum, we vacate the summary judgment in favor of Lester in his individual capacity and in favor of Lee in his official capacity on the free exercise claim.[10]

### B.

▮▮▮▮ Lovelace also challenges the prison Ramadan policy on procedural due process grounds. To succeed on this claim, Lovelace must show that: he was denied a liberty interest protected by the Due Process Clause, an interest that can arise either from the Constitution itself or from state laws or policies, *Wilkinson v. Austin*, 545 U.S. 209, 220–221, 125 S.Ct. 2384, 2393, 162 L.Ed.2d 174 (2005); this denial imposed on him an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); and the process that the state prison employed was constitutionally inadequate, *Wilkinson*, 125 S.Ct. at 2395–96, 125 S.Ct. 2384 (2005). The adequacy of the procedures in place is assessed by balancing three factors: (1) the private interest affected by the government action; (2) the risk of erroneous deprivation through the procedures used

and the probable value, if any, of alternative or additional procedures; and (3) the state's interest, including the function involved and the fiscal and administrative burdens of added safeguards. *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). This third factor encompasses the state's interest in prison management, particularly in allocating scarce resources and in maintaining order, security, and discipline. *See id.* at 2396–97, 125 S.Ct. 2384; *see also Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (recognizing that there must be "mutual accommodation" between institutional needs and inmates' constitutional protections). Additionally, to establish liability under § 1983, Lovelace must show that the defendants acted intentionally in depriving him of his protected interest. Because the protections of the Due Process Clause are not triggered by the "mere failure to take reasonable care," negligent deprivations are not actionable under § 1983. *Pink*, 52 F.3d at 75; *see also Daniels*, 474 U.S. at 330–31, 106 S.Ct. 662.

The district court failed to address Lovelace's due process claim, presumably because it had already concluded that "the actions of defendants were negligent rather than intentional." J.A. 168. But this conclusion (even if it were correct as to all the defendants) has no bearing on Lovelace's official-capacity suit against Warden Lee for issuing the policy. Lovelace alleges that the policy by its own terms allowed due process violations in the identification and removal of offenders from the pass list.

▮▮▮ We remand for further proceedings on the due process claim against Lee

---

**10.** We do not decide whether Lester is entitled to qualified immunity on the free exercise claim because he did not raise this defense in his motion for summary judgment. Our earlier evaluation of whether Lester is entitled to qualified immunity on the RLUIPA claim has some bearing on this question, however.

in his official capacity. The district court must evaluate in the first instance (1) whether Lovelace has a liberty interest in Ramadan observance that is protected by the Due Process Clause and (2) if so, whether the prison's post-deprivation grievance process, which lasted nearly two months and ended one month after Ramadan, was unconstitutional in its failure to guard against erroneous deprivations and arbitrary decisionmaking. *See Wilkinson,* 125 S.Ct. at 2396.

The dissent would have this court consider and dismiss Lovelace's due process claim against the warden in his official capacity, even though the district court did not address the claim. Lovelace's due process claim might ultimately fail, but for now we should be "mindful that we are a court of review, not of first view." *Cutter,* 544 U.S. at 718 n. 7, 125 S.Ct. 2113. Several considerations counsel against our rejection of this claim without the benefit of district court consideration. The second *Mathews v. Eldridge* factor instructs a court to consider "the risk of an erroneous deprivation ... through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335, 96 S.Ct. 893. Here, when Lovelace filed his unsuccessful grievances and complaints, prison officials limited their inquiry to determining that Officer Lester was standing behind his report that he had seen Lovelace break the fast. The dissent suggests that this inquiry was sufficient. Lovelace, however, urged prison officials to take additional steps at the time: among other things, he requested officials to view the cafeteria surveillance tapes for the lunch period in question and to show Lovelace's face card to Officer Lester in an effort to determine whether Lester had correctly identified him. These additional steps were not taken, and the prison has not discussed their probable value, or lack of value, to the

process. Nor has the prison explained, under the third *Mathews v. Eldridge* factor, whether the additional steps would have imposed "fiscal and administrative" burdens that made them impractical. *Id.* It is not "the worst kind of judicial intrusion," as the dissent charges, *post* at 64, for us to have the district court consider these relevant questions in the first instance.

## IV.

Finally, Lovelace challenges two of the district court's procedural rulings. Lovelace first argues that the district court erred in granting Lee's motion for enlargement of time to respond to the complaint, Fed.R.Civ.P. 6(b), and in denying his own motion for a default judgment against Lee, Fed.R.Civ.P. 55(b). Lee stated in his motion that he and counsel "had some difficulty establishing contact with each other" and that "further delay occurred" when he and counsel tried to determine when he was served with process. J.A. 103. Lee filed this motion on May 28, 2004, four days after his response to Lovelace's complaint was due. Finding that Lee "ha[d] shown good cause for his failure to file a timely response to the complaint," the district court granted Lee's motion for enlargement of time and denied Lovelace's motion for a default judgment. J.A. 162.

A district court has discretion to grant an enlargement of time "upon motion made after the expiration of the specified period ... where the failure to act was the result of excusable neglect." Fed.R.Civ.P. 6(b). We find no abuse of discretion here. The district court had a reasonable basis for finding good cause (or excusable neglect) for Lee's delay, given that Lee had difficulty establishing contact with counsel and filed a motion for an extension

of time within four days after his responsive pleading was due.

■ Lovelace also challenges the district court's decision to consider Lester's second, executed affidavit on grounds that the affidavit was "untimely [and] ... incredible on its face." J.A. 190. Lee submitted his executed affidavit on October 17, 2003, roughly five weeks after he submitted his motion for summary judgment along with his first, unexecuted affidavit. A district court has discretion to accept an untimely affidavit. *See* Fed.R.Civ.P. 6(b), 6(d). While it is puzzling that Lester did not offer any explanation for his five-week delay, we cannot say that the district court abused its discretion in considering the late affidavit, an important document in this case.

## V.

We vacate summary judgment in favor of Officer Lester in his individual capacity on the RLUIPA and free exercise claims. We vacate summary judgment in favor of Warden Lee on the claims asserted against him in his official capacity. We affirm the remainder of the district court's rulings. Having vacated in part, we remand for proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED.*

WILKINSON, Circuit Judge, concurring in the judgment in part and dissenting in part:

The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. (2000), is an expression of our nation's commitment to religious freedom. This case involves precisely the type of policy that RLUIPA seeks to foster: because Muslim inmates observing Ramadan must fast during daylight hours, prison officials have provided them with separate meals at nonstandard times. Somehow, the majority finds that even this may not have been enough. To make matters worse, it finds that this enlightened policy—one which fortunately exceeds the level of religious accommodation routinely provided in other prisons—is questionable not only under RLUIPA but on two different constitutional grounds.

With this result, the majority has turned the high congressional command of religious accommodation into an administrative nightmare for state penal institutions and district courts alike. Disregarding the deference historically accorded prison administrators, *see, e.g., Beard v. Banks,* 548 U.S. ——, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006) (plurality); *Cutter v. Wilkinson,* 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), the majority subjects even the most progressive of policies to the most intrusive judicial supervision. Having opened the floodgates, the majority leaves us all at sea. It offers no guidance to prison administrators or district courts. It neglects to define—even in broad brush—what types of policies it would have penal institutions adopt or what kinds of practices it may or may not one day find acceptable. The only certainty that the majority guarantees is litigation over matters large and small, with federal courts thrust into a role they have sought assiduously to avoid—that of micromanaging state prisons.

I am the first to agree that plaintiff Lovelace's religious liberties may have been impermissibly infringed. But that infringement occurred as a result of the errant and possibly malicious actions of a prison guard. The majority rightly holds that Lovelace has presented an issue of triable fact as to whether correctional officer Lester intentionally violated his religious liberty, and that RLUIPA provides a cause of action to redress this type of

infringement. In short, Lovelace should and will have the chance to vindicate his right to religious liberty in federal court.

But the majority cannot rest content. Its endless protestations to the side, the idea that this case need only await appropriate deference to the prison's Ramadan policy on remand completely overlooks the fact that the policy has never once been drawn into question. The majority's assurances about its benign little remand thus presuppose the issue. Keen Mountain's prison policy is not at issue here because it seeks to accommodate, not to burden, religious freedom. The policy is not at issue because it is keyed to what the Supreme Court has told us a policy may rightly be keyed to: the sincerity of a religious belief, rather than its truth. The policy is not at issue because it cannot be said to have caused Lovelace's alleged injury—indeed, that injury was caused by an alleged policy violation. Finally, the prison policy makes clear on its face the safety and security concerns that somehow elude only the majority and that underlie the sole limitation placed on the policy's accommodation of inmates who are released from their cells to participate in Ramadan: that they be sincere.

Thus the majority's remand must be seen for precisely what it is: an invitation to finetune prison policy from the judicial perch. While a prison policy may well be called into question where it imposes a substantial burden on religious freedom, this is not such a case. It is plaintiff Lovelace who must prove under the statute that the policy, as opposed to Lester's violation of it, somehow imposed a substantial burden upon his religious exercise, and he has not even begun to do so. To enlarge a case involving an essentially individual act into a wholesale attack upon a sound prison policy, on no fewer than three different grounds, not only makes a

mountain out of a molehill but also reinforces the old adage that no good deed goes unpunished. Under the majority's view, the most progressive and enlightened prison policy imaginable, a policy that accommodates every religion in every way, would be called into question by a single policy violation. Forcing prison officials to pay for their own progressive steps to protect religious liberty runs counter to the precise statutory and constitutional provisions that the majority purports to enforce. I therefore concur in the judgment remanding the case for further proceedings against defendant Lester, but I respectfully dissent from the majority's RLUIPA, free exercise, and due process determinations as to the prison policy itself.

## I.

### A.

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that the burden is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000cc–1(a). The majority asserts that "Lovelace's removal from the Ramadan observance pass list at Keen Mountain qualifies as a substantial burden under RLUIPA." Maj. Op. at 187. To the extent that the appellant's removal was predicated on false information reported by correctional officer Lester, there indeed exists a genuine issue of fact as to whether Lester as an individual imposed a substantial burden in violation of RLUIPA. *See* 42 U.S.C. § 2000cc–5(4).

But the majority goes further. It asserts that Keen Mountain's Ramadan policy itself may have imposed a substantial burden on the plaintiff's religious exercise.

How exactly this policy may have done so is something that the majority utterly neglects to explain. Missing is a crucial step, the determination of how the substantial burden suffered by Lovelace arose from the prison policy itself.

This failure by the majority is all the more evident because it is Lovelace, not the Department of Corrections, that bears the burden of proving a substantial burden. *See* 42 U.S.C. § 2000cc–2(b). The appellant here did not just fail to meet this burden; it is unclear that he ever alleged that the policy created a substantial burden in the first place. And, indeed, in a strict sense, I am not even convinced that Lovelace has standing to seek equitable relief. His injury is traceable not to the policy but to a prison guard who acted in total derogation of it. *See, e.g., Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (Article III "requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant"). In addition, while Lovelace surely has standing for his individual claim against the possibly malicious violation of his religious liberty by correctional officer Lester, an injunction is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again."

*City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In any case, the majority has taken it upon itself to create a claim for the plaintiff and then to decide it in his favor, all the while never precisely articulating the nature of the claim. All that is clear is that, according to the majority, the flagrant abuse of a prison policy by one individual somehow impugns the policy itself.

The majority defines a "substantial burden" as "one that 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " Maj. Op. at 187 (quoting *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)).[1] It is impossible to imagine how the Keen Mountain Ramadan policy does anything of the kind. The Ramadan fast occupies a special place as one of the central tenets of Islam. Prescribed in the Muslim holy scripture of the Qur'an, the month-long holiday is celebrated by Muslims around the world as a time of great religious and cultural significance. Far from burdening this observance, the Keen Mountain policy seeks to accommodate it as much as possible within the prison setting. As such, the policy lies entirely at the other end of the spectrum from the types of intolerant actions that RLUIPA condemns.

But so eager is the majority to subject this policy to judicial scrutiny that it de-

---

**1.** The Supreme Court in *Thomas* actually held, "Where the state *conditions receipt of an important benefit* upon conduct proscribed by a religious faith, *or* where it *denies such a benefit* because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." 450 U.S. at 717–18, 101 S.Ct. 1425 (emphasis added).

The present case does not fit this definition at all. The state has conditioned no benefit

upon proscribed conduct. Instead, the state has provided otherwise unavailable benefits—group assemblies and out-of-hours meals—in the interest of religious exercise and has only conditioned them on behavior *in accordance with,* rather than proscribed by, inmates' religious beliefs. Thus the majority's attempt to ground its standard in Supreme Court authority is unpersuasive. This inaccuracy is immaterial, however, as the policy here does not constitute a substantial burden under any reasonable definition of the term.

clines to discuss in any detail the substance of the policy itself. This is a shame, because the policy manifestly represents an admirable effort at religious accommodation. It recognizes and respects the importance of the Ramadan fast as one of the "essential tenet[s] of Islam." *See* J.A. 30. Over a month before Ramadan was scheduled to begin, the warden issued a memorandum informing prisoners of the dates of Ramadan and describing the special arrangements that would be made for "[i]nmates wishing to participate in this event." J.A. 27. Prisoners had over three weeks to request inclusion by notifying the Chaplain, who would "place [their] names on a Master Pass List to be utilized by Security and Food Service." *Id.* During the month of the fast, Muslim prisoners were permitted to leave their cells to congregate for special meals "before sunrise and after sunset." *Id.* To accommodate this religiously required eating schedule, the prison opened two dining halls—one for inmates belonging to the Nation of Islam (NOI) and another for inmates belonging to the World Community of Islam—for group meals at the non-standard hours of 5:00 am and 6:00 pm. In addition, "[p]rayer services [were] held either before or after the breakfast meal in the dining hall." *Id.* During Ramadan, the participating prisoners were "expected to adhere to the rule of the fasting period as outlined by the Nation of Islam and the World Community of Islam." *Id.* Anyone observed breaking the fast by participating in regular daytime meals would lose his eligibility to participate in the program. *Id.*

How this policy could impose a "substantial burden" upon religious exercise is quite beyond me. Like RLUIPA itself, this policy has both the intent and effect of "facilitat[ing] opportunities for inmates to engage in the free exercise of religion." *See Madison v. Riter*, 355 F.3d 310, 317

(4th Cir.2003). Prisons should be encouraged to adopt policies that accommodate inmates' religious beliefs, not punished for doing so.

B.

Not only is the Keen Mountain policy clearly a religious accommodation rather than a burden, but it is keyed precisely to what the Supreme Court has said such policies may take into account: the sincerity of an inmate's religious request. The Keen Mountain policy accommodates Ramadan observance only for those inmates who actually observe the Ramadan fast. Such a sincerity requirement is in no way a substantial burden on religious exercise. To the contrary, it is the threshold inquiry of any religious accommodation claim. The Supreme Court has long recognized in the free exercise context that "while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the *threshold* question of sincerity which must be resolved in every case." *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)(emphasis added); *see, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (noting sincerity of respondents' religious beliefs at outset of free exercise analysis).

The same outcome obtains under RLUIPA. The Supreme Court has specifically instructed that, under RLUIPA, "prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic." *Cutter*, 544 U.S. at 725 n. 13, 125 S.Ct. 2113. "Prison officials ... can and do assess the sincerity of inmate's religious beliefs in order to administer prison programs and policies ranging from requests for exceptions to grooming poli-

cies or personal property rules to approval for special meals." *Gartrell v. Ashcroft,* 191 F.Supp.2d 23 (D.D.C.2002). There is simply no question that, under RLUIPA, prisons may do exactly what this policy did: ensure that religious accommodation extends only to sincere observers.

At the time that Lovelace was excluded from Ramadan, the sincerity of his beliefs was precisely the issue.[2] The policy was designed to accommodate only sincere observers by the most reliable indicator possible: the would-be observers' own religious practice. Without such an indicator, and without the ability to remove insincere participants, prisons would find themselves providing special religious meals for fasts that the inmates themselves were not observing. Taken to its extreme, such a policy would allow inmates to attend five group meals a day with impunity.

For exactly such reasons, the Eighth Circuit upheld a policy almost identical to the one at issue here. *See Brown–El v. Harris,* 26 F.3d 68, 69 (8th Cir.1994). The court held that excluding an inmate who broke the Ramadan fast from further participation in no way restricted his religious freedom. *Id.* As the court said, "Rather than burdening Ramadan worshippers, the [prison] policy allows full participation in the fast and removes from the procedures only those worshippers who choose to break the fast." *Id.* at 69–70. *See also Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (prison officials may inquire into sincerity of inmate requesting kosher meals); *McElyea v. Babbitt,* 833 F.2d 196, 198 (9th Cir.1987) (prison authorities may deny insincere requests for religious meals); 28 C.F.R. § 548.20(b) (2005) (Federal Bureau of Prisons inmates may be removed from religious diet accommodation for violation of diet requirements).

Nevertheless, the majority insists that the policy imposed a substantial burden, not because Lovelace was removed from Ramadan meals, but either because he missed the group prayers that accompanied the Ramadan meals or because he was not provided with alternative services. These arguments show how far afield the majority is willing to go in order to implicate the prison policy in harm that arose, if it did so at all, from the conduct of one individual.

As to the Ramadan group prayers, the majority misrepresents the nature of the Keen Mountain policy. The prison allowed inmates to leave their cells for one observance, a group meal accompanied by prayers. The prison policy characterized this observance as one "event," and inmates were on notice that, in order to maintain eligibility for the event, they were to observe the Ramadan fast. To suggest that Lovelace was excluded from an independent prayer observance is to mischaracterize the event as it was designed and explained to the inmates.

Moreover, the group event as designed was more than adequate religious accommodation. Other prison Ramadan policies have provided neither group meals nor group prayer. *See, e.g., DeHart v. Horn,* 390 F.3d 262, 265 (3d Cir.2004) (Ramadan meals served in cells); *Love v. Reed,* 216 F.3d 682, 691 (8th Cir.2000) (same); *Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990) (same); *Tisdale v. Dobbs,* 807 F.2d 734, 736 (8th Cir.1986) (upholding Ramadan policy serving bologna sandwiches to inmates in cells). And yet, the majority implies that Keen Mountain must

---

**2.** The majority characterizes Lovelace's removal from the Ramadan pass list as "discipline (punishment for his alleged infraction)." Maj. Op. at 189. The plaintiff was removed from the pass list not as a punishment but because he appeared to have broken his own fast.

not only provide group meals and group prayers but must provide them independently of each other, though Lovelace never requested of Keen Mountain that he be permitted to participate in one activity and not the other. Thus the majority once again takes an admirably progressive policy and finds inventive ways to pick fault with it.

Even if the majority's depiction of the policy were accurate, it would be reasonable for a prison to consider adherence to the Ramadan fast, the central feature of Ramadan, an indicator of genuine interest in Ramadan observance as a whole. *See Mosier v. Maynard,* 937 F.2d 1521, 1527 (10th Cir.1991) (noting the "primacy of personal statements and conduct" in evaluating the sincerity of requests for religious accommodation); *Beerheide v. Suthers,* 82 F.Supp.2d 1190, 1194 (D.Colo.2000) (examining evidence of inmate's other religious practices in determining sincerity of request for Kosher meals). The majority would apparently have courts second-guess prisons' determinations as to each subset of each inmate's particular religious practices. In the majority's view, an inmate might be sincere as to subtenet A of a religious practice and insincere with respect to subtenets B and C and administrators will have to sort through and accomodate. To be blunt, a requirement this refined will exceed anyone's knowledge or understanding of the infinite variety of religious observance, and it will drive prison administrators crazy.

As to alternative services, to say that Keen Mountain should have provided them is to lose sight of the fact that Keen Mountain does already provide a wide array of religious programming, including Islamic services other than the Ramadan event at issue here. All the prison asks is that inmates select their preferred observance in a timely manner. Inmates signed up for Ramadan observances voluntarily, fully aware that participation required adherence to the fast. An inmate who preferred not to observe the fast could choose another form of religious service, including regular Friday Jumu'ah services. It cannot be a defect in a policy that it provides inmates with the religious accommodations they request. Nor is it a defect when Keen Mountain is unable immediately to provide alternate accommodations should inmates abandon their original intentions. Prisons require adequate notice to accommodate changes in religious requests, and their doing so in no way imposes a substantial burden on religious practice.

In this case, Lovelace did not change his mind about his observance preferences but instead alleges that a guard wrongly reported him as having broken the observance he chose. The guard may certainly have burdened Lovelace's religious exercise. But the majority seems to believe that Keen Mountain should have had backup religious accommodations at the ready for this contingency. This goes far beyond RLUIPA's requirements: it asks prisons not only to accommodate sincere religious requests but to anticipate and provide for any possible complication. This argument only underscores the fact the prison policy posed no violation of RLUIPA.

Thus, neither the plaintiff nor the majority has established that the prison's Ramadan policy imposes any kind of substantial burden on religious exercise. It goes admirably beyond the policies that other courts have upheld. In permitting inmates to leave their cells for group meals and prayers, the policy stands out among its peers as particularly accommodating. In its restriction to sincere observers, it is entirely in accordance with Supreme Court precedent, all of which has characterized a sincerity requirement not as a substantial burden but as a "threshold question" in

matters of religious accommodation. *See Seeger*, 380 U.S. at 185, 85 S.Ct. 850. To repeat: any substantial burden on Lovelace's religious exercise arose from one individual's abuse of the prison policy, not the policy itself.

## II.

Even assuming that a prison policy so accommodating of religious exercise as this one could impose a substantial burden, plaintiff's claim still fails because the policy is narrowly tailored to a compelling government interest. *See* 42 U.S.C. § 2000cc–1(a). RLUIPA does not give prisoners an unfettered right to religious accommodation. Rather, the statute mandates "due deference to the experience and expertise of prison and jail administrators." *Cutter*, 544 U.S. at 723, 125 S.Ct. 2113. And, while the Act adopts a compelling governmental interest standard, "context matters in the application of that standard." *Id.* (internal quotation marks omitted).

## A.

To begin with, the majority's approach exhibits not deference, but distrust. Although due deference is nowhere more appropriate than in the context of a state prison program that implicates order, safety, and security, *see Madison*, 355 F.3d at 321, the majority uses Keen Mountain's Ramadan policy as a platform from which to initiate an assault on state correctional facilities. It affords, not "due deference," but no deference to "the experience and expertise" of prison officials. *Compare Cutter*, 544 U.S. at 723, 125 S.Ct. 2113. The majority refuses to find any compelling interest in regulating state prisons and looks for "arguabl[e]" grounds on which to remand. Maj. Op. at 191. But, since it barely discusses the actual policy, it perforce does not suggest what would satisfy

its standard on remand. In remanding, the majority transforms a landmark statute on religious liberty into an administratively unworkable and constitutionally infirm quagmire. At bottom, the majority's no-deference approach is synonymous with federal court control of routine prison policy.

Sadly, it is not just in its readiness to find fault with prison policy that the majority's lack of deference is apparent. One looks in vain for any appreciation of the number of inmates Keen Mountain prison administrators supervise, the budgetary restrictions they labor under, the staffing problems they encounter, or what other religious practices they may be required to accommodate. One needs no remand to understand these facts of life in a prison setting. Somehow, in the majority's theoretical judicial universe, considerations such as these have melted into insignificance. They are highly significant for prison administrators, however, because they are the practical and often intractable difficulties with which officials must daily deal. The majority's unwillingness to discuss the particular, often ameliorative, features of Keen Mountain's policy is compounded by its equally adamant refusal even to acknowledge the constraints of the setting in which the policy must be implemented. *Compare Cutter*, 544 U.S. at 723, 125 S.Ct. 2113 ("[C]ontext matters in the application of [the compelling interest] standard.") (internal quotation marks omitted). It is this lack of appreciation for reality outside the courtroom that will in time pose the greatest threat to RLUIPA's aims.

This approach cannot be squared with the Supreme Court's recent opinion in *Cutter*. To be sure, the majority quotes liberally from *Cutter's* repeated injunctions for caution. But the majority ignores its own exhortations to consider Keen Moun-

tain's prison "context," Maj. Op. at 189 (quoting *Cutter*, 544 U.S. at 723, 125 S.Ct. 2113), in which "security deserves 'particular sensitivity,' " *id.* (quoting *Cutter*, 544 U.S. at 723, 125 S.Ct. 2113), and where "due deference to the experience and expertise of prison and jail administrators" must be given, *id.* (quoting *Cutter*, 544 U.S. at 723, 125 S.Ct. 2113). *Compare Beard,* 126 S.Ct. at 2581 ("The [court of appeal's] statements and conclusions here also offer too little deference to the judgment of prison officials."). If the majority's intensifying scrutiny of state prisons affords "due deference" to prison officials, then those words have lost their meaning.

The majority's no-deference approach conflicts with the approach adopted by other courts of appeals. *See, e.g., Borzych v. Frank,* 439 F.3d 388, 390–91 (7th Cir. 2006); *Hoevenaar v. Lazaroff,* 422 F.3d 366, 370–72 (6th Cir.2005); *Brunskill v. Boyd,* 141 Fed.Appx. 771, 776 (11th Cir. 2005). In *Hoevenaar,* for example, the Sixth Circuit reversed the district court for failing to give proper deference to the expertise and experience of prison officials. 422 F.3d at 370–72. The district court there had fashioned its own exception to a prison hairstyle regulation for low-risk inmates. *See id.* at 368. The court then concluded that its own version of the policy was a "less restrictive means," and, as a result, that the actual prison policy violated RLUIPA. *Id.* The Sixth Circuit reversed, holding that the district court "under the guise of" the least restrictive means test had "improperly substituted its judgment for that of prison officials." *Id.* at 370. This was "just what the Supreme Court and Congress have warned against." *Id.* (original emphasis omitted). The majority today makes the same mistake: it invites lower courts to substitute their own judgment for that of prison officials.

The majority's no-deference view today also conflicts with our own precedent. In *Madison,* we upheld RLUIPA against a facial Establishment Clause challenge. 355 F.3d at 322. In so doing, we rejected Virginia's allegations that "RLUIPA's compelling interest test will bind [the Commonwealth's] hands" and "hamstring the ability of the Commonwealth's correctional officials to ensure order and safety in the Commonwealth's prisons." *Id.* at 321. RLUIPA would do no such thing, we explained, because it "still affords prison administrators with flexibility to regulate prisoners' religious practices." *Id.* We found compelling the experience of federal correctional officials who, under the materially identical provisions of RFRA, continued to prevail in the overwhelming majority of cases alleging a substantial burden. *See id.* The majority, however, countermands RLUIPA's effort to "afford[ ] prison administrators with flexibility to regulate prisoners' religious practices." *Id.* Instead, the majority's approach would soon draw federal courts into the minute details of penal institutions, a result *Cutter* refused to countenance. *See Cutter,* 544 U.S. at 723, 125 S.Ct. 2113.

B.

Although the majority fails to recognize any compelling governmental interest in regulating the pre-dawn and after-dark release of inmates from their cells, this does not mean there are none. Indeed, the majority suggests that in remanding it asks only that Keen Mountain explain the policy's restrictions by referencing "any institutional need to maintain good order, security, and discipline or to control costs." Maj. Op. at 191. But a number of those "institutional need[s]" are clear from the face of the Ramadan policy: a policy enacted with safety and security considerations front and center. *See* J.A. 27, 188.

To begin with, the policy provided for orderly administration of after-hours meals. *See* J.A. 27. Inmates were expected, for example, to be prompt and on time for meals—late participants were not to be admitted. *Id.* The safety and security interests inherent in the policy are just as evident. Indeed, the purpose of the Ramadan Master Pass List was to provide the names of participating inmates (inmates who would be released from their cells to participate in group activities during nonstandard hours) to security and food service staff. *Id.* Inmates were "outcounted" after every meal. *Id.* The policy also provided that meal times and schedules could be "altered" by the Security Supervisor in order "to meet the needs of the operation of the institution." *Id.* Finally, prison security staff were charged with reporting inmates observed at other meals to the Assistant Warden of Operations. *Id.*

In short, the "institutional need to maintain good order, security, and discipline" by keeping track of inmates and their out-of-cell activities could not be more evident. *See* Maj. Op. at 15. The compelling interest that the majority purports to demand is plainly contained within the four corners of the very policy it calls into question. Indeed, Keen Mountain's compelling interests in safety, security, and cost control escape no one but the majority. The institutional interests certainly did not escape plaintiff Lovelace, who in his petition for appeal noted that Keen Mountain administrators had "adamantly and steadfastly maintained that their actions against plaintiff were intentional, purposeful, and *necessary to maintain security.*" J.A. 188 (emphasis added).

One need not therefore "generat[e] explanations," Maj. Op. at 194, to see that the Commonwealth's "legitimate interest in removing inmates from religious dietary programs" where the inmate fails to comply with program rules, J.A. 57, evinces these security and other interests—namely, order, discipline, and the effective functioning of Keen Mountain. Nowhere are such interests more compelling than in the after-hours release of prisoners from their cells. *See Brown–El,* 26 F.3d at 69 ("[P]rison staff is reduced at night and escape risks increase after dark.").

I recognize that administrative convenience is normally seen as a rational or legitimate interest, not a compelling one. It is hard to imagine, however, how these general administrative interests, when advanced in the prison setting, could be other than sufficiently intertwined with the more serious interests in safety and security so as to render them compelling. As the Supreme Court recognized in *Cutter,* it is simply impossible to divorce a prison's compelling interests in safety and security from internal administration and order. *See Cutter,* 544 U.S. at 723, 726, 125 S.Ct. 2113.

The Ramadan policy releases a large number of inmates from their cells at nonstandard hours for group meals and prayer. While one might hope for good deportment on the part of those released, it cannot be guaranteed. Personal animosities and religious rivalries may exist and spill over into these gatherings. Some inmates, for example, may think other inmates insufficiently observant and view them as taking unfair advantage of the offered religious accommodation. Some inmates may believe that others are taking more than their fair share of food, particularly where, as here, they have been fasting all day and are hungry. Tempers can flare from the simple act of someone cutting in line. We would hope that such differences would not erupt in altercations, but we cannot be sure. Dining rooms occasionally prove to be rowdy environ-

ments for camps and schools, not to mention prisons. In this volatile setting, even the most rudimentary dictates of caution suggest that we recognize as compelling the need to administer the Keen Mountain Ramadan program in a safe and secure fashion. It is simply no answer to say that all of this will be explored by the district court on remand because it is precisely the sort of judicial finetuning invited by remand that the Supreme Court has repeatedly deplored. *See, e.g., Cutter,* 544 U.S. at 723, 125 S.Ct. 2113.

### C.

I also disagree with any suggestion that the Virginia policy is not narrowly tailored. *See* 42 U.S.C. § 2000cc–1(a). It is indeed difficult to imagine a more narrowly tailored policy than the one Virginia now has. The Ramadan policy tracks the religious rules of Ramadan itself and "removes from the procedures only those worshippers who choose to break the fast." *See Brown–El,* 26 F.3d at 70. The so-called "broad" removal provision, *see* Maj. Op. at 3, contains only one limitation: it merely ensures the good intentions of program participants. It is critical for a correctional facility to verify that the individuals it accommodates—with special meals, group prayer sessions, and the like—are genuinely interested in the stated purpose of assembly. And, as we have recognized, protecting religious freedoms creates the temptation for inmates to win special privileges by advancing false religious claims. *See Madison,* 355 F.3d at 319. Nothing in RLUIPA requires authorities to discount this danger.

The policy's removal provision, moreover, is narrowly tailored in that it goes to great lengths to provide inmates a number of procedural protections. The policy allows incident reports to be filed only with Mr. Shinault, the Assistant Warden of Op-

erations. J.A. 27. And the policy further protects inmates from wrongful removal by specifying that reports may be filed only by security and food service staff, not by other inmates. *Id.*

The majority protests, however, that the removal provision is "broad" and "far reaching" because it excludes inmates who violate the tenets of Ramadan from prayer services as well as meals. Maj. Op. at 192, 17. But, as noted earlier, the group meals and accompanying prayers are a single religious accommodation, not separate events. With respect to narrow tailoring, moreover, the distinction between meals and group prayer is one without a difference. Freeing inmates during pre-dawn and post-sunset hours may entail security risks regardless of whether inmates are released from their cells to attend group prayer or to receive a meal. *See Walker v. Blackwell,* 411 F.2d 23, 25 (5th Cir.1969) ("The movement of people after the sun is down presents a problem."). Second, as the majority apparently concedes with respect to the meals, an institution may verify the religious sincerity of Ramadan participants. The difficulty, of course, is in the majority's distinction between meals and prayer. The breaking of the Ramadan fast suggests a lack of genuine interest in any Ramadan activity. If the majority recognizes this for the meals, it should recognize it also for the prayers.

The majority also suggests that the Ramadan policy is not the "least restrictive means" available because Lovelace was unable to attend alternative religious services. Maj. Op. at 193. But the policy implements a broader institutional concern: Virginia's Department of Corrections, for obvious organizational and safety reasons, allows inmates to participate in the religion of their choice, but only one religion, per calendar quarter. *Compare*

28 C.F.R. § 548.20(c) (inmate may attend one religious group's ceremonial meal per calendar year). Such a policy is not just an appropriate means of achieving Keen Mountain's compelling interests in restricting inmate movement and maintaining proper order. *See Spavone*, 420 F.Supp.2d at 240. This aspect of the policy—like the policy as a whole—honors and respects the desire of Muslim inmates to observe the Ramadan fast. The policy does this by recognizing the occasion of the fast as a practice of deep religious significance, not an exercise in who can sneak an extra meal or spend more time out of a cell.

Rather than accepting the policy for the generous accommodation it is or attempting to explain *how the policy imposes a substantial burden*, the majority offers a remand. The remand offers no help whatsoever to the lower court or the litigants. The only instruction the majority gives is that the district court should decide on remand whether the policy is the "least restrictive way" of furthering prison interests. *See* Maj. Op. at 193. Restating the legal standard, however, provides no guidance, and the majority thus invites an open-ended and potentially wide-ranging inquiry into prison administration. This approach may well require extensive testimony on the part of prison administrators and may devolve into a proverbial battle of the experts. It is no answer to say that the district court might ultimately decide to uphold the policy on remand: remand is itself an instruction to the district court to delve into minute prison details.

Second, narrow tailoring in the prison context cannot mean what the majority suggests. I quite understand and agree that RLUIPA directs prison administrators to employ the "least restrictive means." *See* 42 U.S.C. § 2000cc–1(a)(2). But just last term in *Cutter*, the Supreme Court made clear that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," 544 U.S. at 722, 125 S.Ct. 2113, and that RLUIPA does not relieve courts from their normal habits of restraint and deference in this most sensitive of settings, *id.* at 723, 125 S.Ct. 2113 (quoting 146 Cong. Rec. S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy)). One need only read the majority's opinion, however, to discover that it means for the lower court to conduct a fact-intensive inquiry into every conceivable prison policy that Keen Mountain *might* have adopted. The majority is quite clear on this when it says that Keen Mountain's Ramadan policy is "*arguably* not the least restrictive means" available to prison authorities. Maj. Op. at 192 (emphasis added). Gone is even the pretense of deference: on remand, burdened prison personnel must now field questions about how many and what kind of alternative means might possibly exist for providing meals or holding hearings. This approach of remanding individual grievances for hearings on speculatively superior general policies will have prison administrators chasing their tails. Thus does the remand wield the least restrictive means test as a tool by which lower courts may endlessly second-guess prison officials. *See Hoevenaar*, 422 F.3d at 370 (finding the lower court had "improperly substituted its judgment for that of prison officials"). This is "just what the Supreme Court and Congress have warned against." *See id.* (original emphasis omitted).

D.

The majority's real quarrel is not with the policy but with Lovelace's personal inability to observe Ramadan. But to require policies to accommodate every set of individual circumstances not only creates

an administrative morass; it also places prison administrators on a collision course with the values embodied in the Establishment Clause and with core federalism principles.

Under the majority's approach, federal judges "become the primary arbiters of what constitutes the best solution" to every religious accommodation problem. *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Questions regarding meals, dress, hygiene, hair styles, and cell decor must now be addressed by federal courts, because all these things can bear upon religious observance. It will be the unusual activity indeed that cannot be connected to the religious tenets of some subset of the prison population. Thus, if Keen Mountain is to be faulted for not accommodating Lovelace individually, there will be no limit to judicial entanglement in the day-to-day operations of prisons. *See Lewis v. Casey,* 518 U.S. 343, 362, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). This cannot be the result Congress intended. Indeed, Congress, which passed RLUIPA, also enacted the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e (2000), precisely to eliminate such "unwarranted federal-court interference with the administration of prisons." *Woodford v. Ngo,* 548 U.S. ——, ——, 126 S.Ct. 2378, 2387, 165 L.Ed.2d 368 (2006) (footnote omitted).

To satisfy the majority's desire to accommodate Lovelace—or any inmate—individually, it would appear that prisons would have to hold hearings on dramatically different schedules in order to ensure timely disposition of grievances relating to everything from one-day observances such as Christmas, to days-long observances such as Passover, to month-long observances such as Ramadan. To tie the timeliness of hearings to the timing and duration of different religious observances would seem an awkward and constitutionally problematic task. The duration of some observances is not even agreed upon. The Easter holiday, for example, might be understood to comprise the period from the beginning of Lent to Easter Sunday, Maundy Thursday to Easter Sunday, Good Friday to Easter Sunday, or Easter Sunday alone. The majority would place prison officials in the position of making difficult judgments about religious questions and being repaid for their efforts by an inmate's complaints that he received a hearing in time for Easter Sunday but not for Good Friday. Should the majority attempt to cure this difficulty with something like a one-day rule—by which religious grievances are addressed within a day—such a rule might work well with respect to Ramadan but would be disadvantageous to faiths with holidays of shorter duration. And, of course, the actual hearings themselves would have to be scheduled not only on an accommodating date but at an accommodating hour.

To read into the requirement of narrow tailoring a requirement approaching individual accommodation will run administrators ragged. It will have no end.

One simply cannot divorce the device of strict scrutiny from setting and context. *See Cutter,* 544 U.S. at 722–23, 125 S.Ct. 2113. As the Supreme Court has cautioned: "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Lewis,* 518 U.S. at 361, 116 S.Ct. 2174 (quoting *Turner,* 482 U.S. at 89, 107 S.Ct. 2254). State prison systems cannot accommodate, to the degree foreshadowed by the majority's remand, the religious beliefs and practices of hundreds of different faiths. *See Charles v. Verhagen,*

220 F.Supp.2d 937, 946–47 (W.D.Wis.2002) (it would be "utterly impractical to allow each of 300 denominations to have its own feast day"). Religions, by their very nature, entail rich and varied forms of worship. Accommodating, in the sense that the majority understands the word, even a small subset of those practices may well stretch prison resources to the breaking point. "Prison administrators, like most government officials, have limited resources to provide the services they are called upon to administer." *Al–Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir.1991). The sheer number of religious dietary requirements could stress the chef of a gourmet restaurant, much less an overburdened staff in a prison kitchen. Likewise, the accommodation of religious exercises at nonstandard hours creates added security risks, *see Brown–El*, 26 F.3d at 69, and requires additional guards and staff, *see Walker*, 411 F.2d at 25. These are not minor concerns—wardens cannot, for example, "just hire anybody off the street." *Id.* at 26.

The RLUIPA envisioned by the majority also creates unnecessary tensions between the Free Exercise and Establishment Clauses. But RLUIPA represents Congress' effort to navigate the "corridor between the Religion Clauses." *See Cutter*, 544 U.S. at 720, 125 S.Ct. 2113. It requires courts to "take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries," and to ensure neutral administration "among different faiths." *Id.* Indeed, the Supreme Court declined to "read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety" precisely because the two Religion Clauses "tend to clash with the other." *Id.* at 719, 722, 125 S.Ct. 2113.

Under the majority's contrary approach, however, "accommodation may devolve into an unlawful fostering of religion." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 334–35, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (internal quotation marks omitted). Whether or not the result posited by the majority would lead to an Establishment Clause violation in fact, *see Madison*, 355 F.3d at 322, it would surely generate difficult constitutional questions. At a minimum, the RLUIPA envisioned by the majority will lead to claims of discrimination among faiths. For example, prison administrators forced to provide specially tailored hearings and procedures risk the appearance of impermissibly "singl[ing] out [ ] particular religious sect[s] for special treatment." *See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 706, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994). It is not difficult to imagine one inmate perceiving all sorts of slights to his religious faith because another inmate down the corridor received some special religious privilege or unique form of treatment. And even if prison officials manage to satisfy the various dress, dietary, scheduling, and hearings requirements of all religious beliefs, such close tailoring of prison procedures to the details of myriad faiths might constitute excessive government involvement with religion beyond that which the Constitution allows. *See Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

Moreover, RLUIPA does not abrogate traditional understandings of federalism and separation of powers in the context of prison management. Rather, as this court has observed: "[C]oncerns of federalism and comparative expertise militate against federal court supervision of administrative decisions made by state departments of corrections." *Lenz v. Washington*, 444

F.3d 295, 304 (4th Cir.2006). "[I]t is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.' " *Woodford,* 548 U.S. at ——, 126 S.Ct. at 2388 (quoting *Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)). Courts are justified in assuming, therefore, that RLUIPA intended to modify, but not to trample upon, states' traditional prerogatives in this area. *See Gregory v. Ashcroft,* 501 U.S. 452, 457–61, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). In fact, the need to support these prerogatives with more than lip service is amplified by federalism concerns, as RLUIPA deals exclusively with state, rather than federal, prisons. *See Turner,* 482 U.S. at 85, 107 S.Ct. 2254.

If *Cutter* conveyed no other message, it signaled to federal courts that RLUIPA must "be applied in an appropriately balanced way." 544 U.S. at 722, 125 S.Ct. 2113. But where the Supreme Court has said, "proceed with caution," the majority has pressed the accelerator. Heedless of the deference due the expertise of prison administrators, heedless of basic principles of statutory interpretation, heedless even of the constitutional dangers of its approach, the majority has placed federal courts at the center of daily prison policy-making.

In so doing, the majority may be undermining the very ideal of religious freedom that RLUIPA is meant to protect. The Supreme Court has counseled caution and deference precisely because, without them, religious accommodation in the penological context threatens to become the tail that wags the dog. Absent due restraint, "inmate requests for religious accommodations [may] become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution." *See Cutter,* 544 U.S. at 726, 125 S.Ct. 2113. The Supreme Court has stated categorically that RLUIPA does not license such excesses, and that, should they come to pass, "facilit[ies] would be free to resist the imposition" by bringing as-applied constitutional challenges to RLUIPA. *Id.* In not granting due deference to prisons in cases like this one, the majority is virtually ensuring that prisons will, in turn, now have to seek their own day in court.

Rather than remanding for further hearings on narrow tailoring, the valid policy at issue here should be upheld and Lovelace should be allowed to proceed against Lester in his claim for deliberate abuse of religious liberty.

## III.

### A.

Because RLUIPA broadly defines "government" to include "any person acting under color of State law," I agree that prison officials may be sued in their individual capacities. *See* 42 U.S.C. § 2000cc–5(4). But the availability of such suits says nothing about whether money damages—in addition to injunctive and declaratory relief—are "appropriate relief." I do not, however, take up the question of money damages with respect to individual defendants because the majority expressly reserves that question. Maj. Op. at 195–196 n. 7.

### B.

The majority also leaves open the question of whether RLUIPA imposes liability for deliberate indifference or other "less than intentional" conduct, Maj. Op. at 195. But this question is not difficult. At the time that Congress passed RLUIPA, the standard for infringements of religious liberty was one of intent. *See Employment*

*Div., Dept. of Human Res. v. Smith,* 494 U.S. 872, 878–79, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). There is no indication at all in RLUIPA that Congress intended to change or modify this intent standard to one of deliberate indifference. In this case, the appellant never alleged a deliberately indifferent violation of RLUIPA or argued for the creation of such a standard: Thus the majority creates the issue and then leaves it open.

As to the issue more generally, Congress has said what Congress has said. As the majority acknowledges, in drafting RLUIPA, Congress did not create a state-of-mind standard. *See* Maj. Op. at 20–21. Instead it enhanced religious protection through other parts of the statute, such as the standard of review and the burden of persuasion. *See* 42 U.S.C. §§ 2000cc–1(a), 2(b); *see also City of Boerne v. Flores,* 521 U.S. 507, 517, 529, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (suggesting that RFRA, RLUIPA's predecessor, intended to enhance protection against intentional violations of free exercise by altering burden of proof). Congress was well aware of the legal backdrop against which it legislated, and where it did not enunciate changes, we would be wise to assume it meant to keep the same law. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 792, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (employing the "presumption that Congress was aware of prior judicial interpretations and, in effect, adopted them"). "[I]t is not our function to engraft on a statute additions which we think the legislature logically might or should have made." *United States v. Cooper Corp.,* 312 U.S. 600, 603, 61 S.Ct. 742, 85 L.Ed. 1071 (1941).

A contrary assumption would not only contravene tenets of statutory interpretation but would also impose a state-of-mind standard on states of which they had no notice, in violation of the Spending Clause. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract, and therefore, to be bound by federally imposed conditions, recipients of federal funds must accept them voluntarily and knowingly. States cannot knowingly accept conditions of which they are unaware or which they are unable to ascertain." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 U.S. ——, ——, 126 S.Ct. 2455, 2459, 165 L.Ed.2d 526 (2006) (citation and internal quotation marks omitted). Here, the Commonwealth was not on notice of a deliberate indifference standard at the time that it accepted federal funds under RLUIPA. To suggest and then leave open the question of such a standard is commensurate with neither deference or restraint.

IV.

Not content to draw into question the prison policy under RLUIPA, the majority finds fault with it on no less than two constitutional grounds. According to the majority, a remand on these issues is appropriate "for obvious reasons." Maj. Op. at 200 n. 9. But to remand in a straightforward case such as this not only violates "the policy of judicial restraint regarding prisoner complaints" that the Supreme Court requires, *see Turner,* 482 U.S. at 85, 107 S.Ct. 2254 (internal quotation marks omitted), but also ignores well settled principles of judicial economy, *see, e.g., Beverati v. Smith,* 120 F.3d 500, 503 (4th Cir. 1997). An appellate court may independently determine whether summary judgment was appropriate on alternative grounds. *See id.* The Ramadan policy poses no issue under either the Free Exercise or the Due Process Clauses and a remand is thus both unnecessary and inappropriate.

### A.

In its eagerness to subject the Ramadan policy to judicial scrutiny, the majority finds a free exercise problem here.[3] Here summary judgment is proper both because the Ramadan policy imposes no burden and because it meets *Turner's* deferential test.

To remand for unspecified further proceedings on a prison policy that imposes no burden overlooks settled law. While the majority is correct that a prison regulation—even one that burdens religious exercise—is valid if it survives *Turner* analysis, it altogether ignores *Turner's* antecedent inquiry. *Turner* "assumes as a predicate that the plaintiff inmate has demonstrated that a constitutionally protected interest is at stake," and that the challenged policy *actually* burdens this interest. *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir.2000) (en banc). The free exercise inquiry thus ends where "[t]he answer to the threshold question is that there is no infringement of religious freedom." *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 F.2d 303, 308 (6th Cir.1983). Where plaintiffs have "failed to sustain their burden ... of establishing ... a substantial burden on [plaintiffs'] exercise of religion" summary judgment is therefore appropriate. *Goodall ex rel. Goodall v. Stafford County Sch. Bd.*, 60 F.3d 168, 173 (4th Cir.1995).

The foregoing discussion of RLUIPA more than suffices to dispose of the free exercise claims here. The Ramadan policy imposes no burden, much less a substantial one. The majority's analysis of burden under the Free Exercise Clause therefore suffers the same infirmities as its analysis of burdens under RLUIPA. The *Turner* inquiry, moreover, prompts an even more deferential standard of review than does RLUIPA. *Turner* says that prison policy need only be "reasonably related to legitimate security interests." *Turner*, 482 U.S. at 91, 107 S.Ct. 2254. "By using the language of rational basis scrutiny, the Supreme Court chose the most deferential possible standard of review," *Long Term Admin. Segregation of Inmates Designated as Five Percenters v. Moore*, 174 F.3d 464, 469 (4th Cir.1999), a standard certainly more deferential than that employed by Congress and the Court in the context of RLUIPA.

Because the Ramadan policy imposes no burden, and because it is "an eminently rational means of achieving the compelling governmental and penological interests of maintaining order, discipline and safety in prisons," *see Hines*, 148 F.3d at 358, summary judgment on plaintiff's free exercise claim was appropriate. *See Goodall ex rel. Goodall*, 60 F.3d at 173. To remand here stands the Free Exercise Clause on its head.

### B.

I agree with the majority that the plaintiff's procedural due process claim against defendants Lee and Shinault fails because their actions were, at most, negligent, and negligent deprivation does not constitute a violation of the Due Process Clause. *See Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir.1995). But the majority insists upon overturning the district court and remanding for a determination of whether the prison grievance

---

**3.** I agree with the majority that Lovelace's free exercise claim against defendants Lee and Shinault fails because their actions were at most negligent. I also agree that the facts, taken in the light most favorable to Lovelace, raise a genuine dispute about whether Lester acted intentionally in depriving Lovelace of his free exercise rights.

process, as established by Warden Lee in his official capacity, violated Lovelace's due process rights.

Reversal and remand are once again unnecessary, because it is clear from the record that no due process deprivation exists. Even assuming that Lovelace was deprived of a protected liberty interest,[4] the record nevertheless establishes that the procedures protecting his interest were adequate. The prison's complaint procedures afforded him the attention of the institution's highest administrators within days. Lovelace filed informal complaints with the Warden and Assistant Warden two days after the incident. One complaint was addressed within a day and the other within two. Lovelace then appealed this outcome through the two-stage Virginia Department of Corrections formal grievance process, which culminated with a decision from the Regional Director on January 4, 2003.

The majority makes much of the fact that the formal grievance process did not conclude until one month after Ramadan, *see* Maj. Op. at 204, but surely the real issue is not how long the process took but how quickly it began. The majority cannot be suggesting that the Virginia Department of Corrections should be faulted for providing more, rather than fewer, levels of administrative review to prisoner complaints. Nor, I hope, is the majority asserting that every level of administrative appeal should occur within the time pa-

rameters set by any given religious holiday.

For prison officials to have provided Lovelace with more process, either they would have had to tailor their grievance procedures to the timeframe of Ramadan, or they would have had to do as Lovelace urges and allow him more opportunity to present evidence of his innocence. Under the three-factor *Mathews v. Eldridge* balancing test, it is clear that either change would be unwarranted. *See* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).[5] In no way disparaging the private liberty interest represented in the first *Eldridge* prong, it is outweighed by the concerns embodied in the second and third. Under the second *Eldridge* prong, it is uncertain that either alternative procedure would have offered the plaintiff better protection against a correctional officer's blatant falsehoods. *Id.* Prison procedures are by nature designed to place some modicum of trust in the people implementing them. It is completely understandable that prison officials would rely upon the eyewitness testimony of a guard and that prison policies would not be geared to allow for face-to-face confrontations between guards and inmates every time there were conflicting accounts of a particular event. *See Wolff v. McDonnell,* 418 U.S. 539, 567, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in

4. A liberty interest "may arise from the Constitution itself ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). Lovelace's liberty interest in this case would presumably be his interest in observing the Ramadan fast, derived from his constitutional free exercise right.

5. *Eldridge* requires courts to balance, "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335, 96 S.Ct. 893.

criminal trials, there would be considerable potential for havoc inside prison walls.").

Meanwhile, under the third *Eldridge* prong, any change in procedure would entail significant unjustifiable costs. *See Eldridge*, 424 U.S. at 335, 96 S.Ct. 893. Conforming grievance procedures to religious holidays would present insurmountable administrative difficulties.[6] One-day holidays would be virtually impossible to accommodate, and prison procedures in general would have to be tailored and retailored to the demands of a blinding variety of religious calendars. Such an approach would not only impose daunting administrative costs, but it would also rob prison procedures of perhaps the most important features of any fair process: uniformity and impartiality. It would moreover have the perverse effect of encouraging inmates to put even secular grievances in religious terms, in order to receive speedier or special treatment. *See Madison*, 355 F.3d at 319. It is thus difficult not to conclude that the prison's uniform post-deprivation grievance process is more constitutionally sound than the suggested alternatives. *See Parratt v. Taylor*, 451 U.S. 527, 543–44, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (post-deprivation hearing sufficient to satisfy due process).

Similarly, demanding that Virginia prisons allow inmates more of an opportunity to present evidence in administrative proceedings would require a costly and potentially dangerous overhaul of state prison procedures. *See, e.g., Wolff*, 418 U.S. at 568–69, 94 S.Ct. 2963. The procedures through which the plaintiff's grievance was addressed are the same procedures used to handle all inmate complaints, including other alleged constitutional violations. In formulating those procedures, the state has had to strike a difficult balance designed to identify bona fide grievances, discourage frivolous ones, and promote both fairness and efficiency. In considering due process challenges, "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin v. Conner*, 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

The problem from Lovelace's perspective was not that the prison did not offer a rapid response to his complaint but that its response was negative. Virginia has devised a set of procedures that attempts to strike the right balance in addressing a wide variety of inmate grievances. It cannot guarantee the right outcome in every circumstance, and where it does not, the courts remain open to the wronged inmate. *See Wolff*, 418 U.S. at 579, 94 S.Ct. 2963. But the courts are there to remedy the particular wrong, not to overhaul the entire system. The majority is using an individual wrong as a springboard for the worst kind of judicial intrusion. In doing so, it has lost sight of the fact that "[f]ederal courts sit not to supervise prisons but to enforce . . . constitutional rights." *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).

## V.

RLUIPA expresses the view that all persons, however circumstanced, should be

---

**6.** By way of comparison, the Federal Bureau of Prisons explicitly provides that inmates removed from religious diets for failure to conform to their requirements "may not be immediately reestablished back into the program." 28 C.F.R. § 548.20(b). Indeed, "[t]he process of reapproving a religious diet for an inmate who voluntarily withdraws or who is removed ordinarily may extend up to thirty days." *Id.* This timeframe is deemed necessary "[i]n order to preserve the integrity and orderly operation of the religious diet program and to prevent fraud." *Id.*

able to derive the support and sustenance that comes from the practice of their particular faiths. It also expresses the hope that the personal strength derived through faith will manifest itself in rehabilitative efforts, respect for others, and a record of good institutional citizenship. These indisputable values are balanced, however, against the difficulties of managing confined and hence combustible prison environments. *See Cutter*, 544 U.S. at 726, 125 S.Ct. 2113. Not content to recognize this case for what it is—a possibly legitimate complaint by a Muslim prison inmate that his Ramadan fasting rights were deliberately and maliciously violated by a prison guard—the majority expands it to what it is not, an excuse for top-to-bottom finetuning of an accommodating policy designed to foster the very values of religious expression set forth in RLUIPA.

If this policy does not merit the majority's approval, then I am hard pressed to think of one that will. It is unfortunate that a policy designed to respect the Ramadan fast for the profound observance that it is should become the means for potentially tying prisons up in knots. No one argues that a court should blindly accept any justification for a prison policy that interferes with religious exercise. But to substitute its own judgment for the accommodative judgment of prison administrators is just as bad. *See Cutter*, 544 U.S. at 717, 723, 725, 125 S.Ct. 2113 n. 13; *Turner*, 482 U.S. at 84–85, 89, 107 S.Ct. 2254; *Madison*, 355 F.3d at 321. It is difficult to overstate the administrative gridlock, penological misjudgments, and unwitting privileging of certain faiths over others that courts will make while embarking on the majority's course. With all respect to my friends in the majority, they have gone much too far and in the process have created administrative and constitutional problems that will come in time to endanger and diminish true religious liberty.